IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

RICHARD BEAM, et al.,

                Plaintiffs,

     v.

TOWNSHIIP OF PEMBERTON, et al.,

                Defendants.

CIVIL ACTION
NO. 19-20380

**OPINION**

**Slomsky, J.**                                                           **March 14, 2023**

## TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................................................ 1

II.   **BACKGROUND** ................................................................................................. 3

   **A.**   **The February 10, 2018 Incident** ................................................................ 3

   **B.**   **Mr. Beam's Alleged Injuries** ..................................................................... 8

   **C.**   **Other Alleged Instances of Harassment of Plaintiffs by Defendants** ........... 9

   **D.**   **Charles Hentz's Expert Report** ................................................................ 10

III.  **STANDARD OF REVIEW** ................................................................................ 14

IV.  **ANALYSIS** ...................................................................................................... 15

   **A.**   **The Opinions of Plaintiffs' Expert Will Be Excluded Because**
       **They Are Legal Conclusions on Ultimate Issues** ...................................... 15

   **B.**   **Plaintiffs' <u>Monell</u> Claims Against Defendants Township of Pemberton**
       **and Township of Pemberton Police Department** ...................................... 18

1.   Plaintiffs Fail to Identify a Township Policy or Custom...................................... 21

2.   Plaintiffs Also Fail to Show Deliberate Indifference by the Township ........................ 24

   a.   Failure to Train ......................................................................................... 24

   b.   Failure to Supervise .................................................................................. 26

   c.   Failure to Investigate................................................................................. 28

C.   **Section 1983 Claims Against Individual Defendants: Qualified Immunity**.............. 30

1.   Count I:  Unlawful Entry .................................................................................. 32

2.   Count I:  Excessive Force ................................................................................ 40

   a.   Constitutional Violation.............................................................................. 40

   b.   Clearly Established .................................................................................... 42

3.   Counts I and IX:  False Arrest and False Imprisonment ............................................ 44

4.   Count I:  Fourteenth Amendment Due Process Violations ........................................ 46

D.   **Plaintiffs' State Law Claims**.......................................................................... 50

1.   Summary Judgment on Plaintiffs' State Law Claims Alleged in Counts VII to XI
Will Be Granted in Favor of Defendants Township of Pemberton
and Township of Pemberton Police Department............................................................ 50

2.   Summary Judgment on Plaintiffs' Negligent Hiring and Retention Claim
Alleged in Count V Will Be Granted in Favor of Defendants Township
of Pemberton and Township of Pemberton Police Department.................................... 51

3.   Summary Judgment on Plaintiffs' State Law Claims Will Be Granted
in Part and Denied in Part as to Officers Wolf and Rossetti ......................................... 53

a.   Civil Conspiracy (Count III) ....................................................... 53

b.   Intentional Infliction of Emotional Distress (Count VII) ........................................... 56

c.   Battery (Count VIII) ................................................................ 58

d.   False Imprisonment (Count IX) .............................................. 59

e.   Abuse of Process (Count X) ....................................................... 60

f.   Malicious Trespass (Count XI) ................................................. 62

**E.   Pemberton Police Department's Chief of Police, Officer Laffan,
and John Does 1-10 Will Be Dismissed as Defendants** ................................................. 63

**V.   CONCLUSION** ..................................................................... 64

## I.     INTRODUCTION

This action arises out of allegations made by Plaintiffs Richard and Dawn Beam ("Plaintiffs") against Defendants Township of Pemberton (the "Township"), Township of Pemberton Police Department ("Pemberton PD"), Township of Pemberton Chief of Police David H. Jantas, Police Officers Tyler Wolf, John Rossetti, and Laffan,[1] and John Does 1-10 (collectively referred to as "Defendants").  (Doc. No. 1.)  The events described in the Complaint occurred in part on February 10, 2018, when Plaintiffs allege that two New Jersey police officers falsely arrested Richard Beam after harassing him on several occasions.  (Id. at 4-6.)  Plaintiffs also allege that the harassment continued after the arrest.  (Id.)  In their Complaint, Plaintiffs assert eleven claims, which include violations of their federal constitutional rights and tortious conduct.  The causes of action, as drafted, appear to assert the following:

a.     Plaintiffs v. All Defendants:  Violations of Plaintiffs' Fourth Amendment and Due Process Rights[2] Pursuant to 42 U.S.C. § 1983 (Count I);

b.     Plaintiffs v. Township of Pemberton:  Municipal and Supervisory Liability for Its Employees' Conduct in Committing the Constitutional Violations (Count II);

c.     Plaintiffs v. All Defendants:  Conspiracy to Violate Plaintiffs' Federal and State Constitutional Rights (Count III);

d.     Plaintiffs v. All Defendants:  Constitutional Torts for Violating Plaintiffs' Federal and State Constitutional Rights (Count IV)[3];

---

[1]  The Complaint incorrectly identifies Officer Laffan as "Officer Lafferty."  (See Doc. No. 1 at 1.)  His first name is not given.

[2]  Although this claim references in its title "statutory rights," none are referred to in the paragraphs that follow.

[3]  The title of this claim is confounding because there is no constitutional "tort" arising from a violation of a federal and/or state constitutional right by a state actor.  It is the federal and/or state constitutional violation that would be the cause of action, if it is recognized in the law.  To the extent Plaintiffs allege an action under Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics, 403 U.S. 388 (1971), the federal analog of § 1983, the claim in Count IV fails.  No Defendant named in the Complaint is a federal officer.

e.      Plaintiffs v. Township of Pemberton:  Negligent Hiring and Retention (Count V);

f.      Plaintiffs v. Township of Pemberton:  Respondeat Superior for Its Employees' Tortious Conduct under State Law (Count VI);

g.      Plaintiffs v. All Defendants:  Intentional Infliction of Emotional Distress (Count VII);

h.      Plaintiffs v. All Defendants:  Battery (Count VIII);

i.      Plaintiffs v. All Defendants:  False Imprisonment (Count IX);

j.      Plaintiffs v. All Defendants:  Abuse of Process (Count X); and

k.      Plaintiffs v. All Defendants:  Malicious Trespass (Count XI).

(Doc. No. 1 at 7-13.)  For all these violations, Plaintiffs seek at least $500,000 in compensatory damages, punitive damages, and reasonable attorneys' fees and costs.  (Id. at 13-14.)

Before the Court is Defendants' Motion for Summary Judgment (Doc. No. 54), Plaintiffs' Response in Opposition (Doc. No. 56), and Defendants' Reply (Doc. No. 59).  Pursuant to the Order dated October 25, 2022 (Doc. No. 60), Plaintiffs filed a Supplemental Memorandum (Doc. No. 61) responding to Defendants' Statement of Material Facts (Doc. No. 54-3).[4]  For reasons that follow, the Motion for Summary Judgment (Doc. No. 54) will be granted in part and denied in part.

---

[4]  On November 3, 2022, Plaintiffs filed their Supplemental Answers and Memorandum Addressing Defendants' Statement of Material Facts.  (Doc. No. 61.)  In this filing, they are responding to Defendants' Statement of Material Facts (Doc. No. 54-3) attached to their Motion for Summary Judgment (Doc. No. 54).  However, as Defendants correctly point out, Plaintiffs' Supplemental Answer and Memorandum exceeds the scope of the October 25, 2022 Order directing Plaintiffs to "support[] or address[] Defendants' Statement of Material Facts." (Doc. Nos. 60 at 1; 62 at 1-2.)  Plaintiffs also include new arguments in further opposition to the Motion for Summary Judgment and reference portions of an export report from Charles Hentz, a retired law enforcement officer with twenty-seven (27) years of experience, which were not provided to Defendants during discovery nor attached to the Response to the Motion. Nonetheless, these additional items do not affect the conclusions in this Opinion.  Moreover, because the expert report contains conclusory opinions on ultimate issues of law, these opinions do not factor into the Court's analysis.

## II.     BACKGROUND

### A.     The February 10, 2018 Incident

This case arises from the arrest of Plaintiff Richard Beam ("Mr. Beam") at his residence at 220 Haddon Road, Pemberton, New Jersey.  (Doc. No. 1 at 4.)  He resides there with his wife, Plaintiff Dawn Beam.  (Id.)  On February 10, 2018, Plaintiffs engaged in a verbal argument during which Mrs. Beam told her six-year-old daughter to call 911.  (Doc. No. 56 at 6.)  After her youngest daughter dialed 911, Mrs. Beam took the phone from her and told the dispatcher to "get [her husband] out of [her] fucking house."  (Doc. No. 54-7 at 51.)  The 911 call ended when Plaintiffs' older son took the phone from the younger daughter and hung up the phone.  (Doc. No. 56 at 7.)[5]  Nothing in the record explains how the 911 dispatcher knew Plaintiffs' address and dispatched it to other officers.  Moreover, there is no indication that Plaintiffs' youngest daughter or their son spoke during the 911 call.

The first officer to arrive at Plaintiffs' residence was Officer Tyler Wolf of the Pemberton Township Police Department.[6]  (Id.)  He met Mr. Beam who was waiting outside because he knew that police officers were required to investigate the 911 call.  (Id.)  Mr. Beam asked Officer Wolf to leave, stating that he wanted the New Jersey State Police to respond.  (Id.)  Officer Wolf told Mr. Beam that he needed to speak with the female who called 911 to ensure the argument was resolved.  (Id.)  During his deposition, Mr. Beam testified that he answered all of Officer Wolf's questions, complied with his instructions, and explained to him that the marital dispute precipitating the 911 call was over.  (Id.)  Mr. Beam further testified that, at Officer Wolf's

---

[5]  Police had responded to domestic disturbances between Mr. and Mrs. Beam on at least three occasions before the February 10, 2018 incident.  (See Doc. No. 54-7 at 49.)  These prior incidents did not lead to arrests or the filing of charges.  (See Doc. No. 61 at 5.)

[6]  Officer Wolf testified at his deposition that he responded to the scene under a Level II priority, which permitted him to activate his lights and siren and to "get around the traffic and through intersections and stop signs[.]"  (Doc. No. 54-9 at 5.)

request, he went to his house to let his wife know that Officer Wolf would like to talk to her. (Id.)  Mr. Beam also said during his deposition that he allowed Officer Wolf to stand with his foot in the front door while he went to ask his wife to go outside and speak with the officer.  (Id. at 8.)  At the entryway, a screen door is located before the front door.  (Id.)

Mr. Beam remained in the house while his wife and their son went outside to talk to Officer Wolf.  (Id. at 9.)  Mrs. Beam told Officer Wolf that she and her husband had gotten into an argument when their daughter called 911 but that "everything was fine."  (Id.)  Officer Wolf asked Mrs. Beam whether she wanted to fill out a domestic violence form.  (See id. at 10.)  Next, Officer John Rossetti, also of the Pemberton Township Police Department, arrived on the scene. (See Doc. No. 54-3 at 3.)  He testified that when he arrived, he heard Mr. Beam yelling from behind the inside of the screen door.  (See id.)

Some of Officer Rossetti's actions and the events leading up to Mr. Beam's arrest and his allegation of the use of excessive force against him remain in dispute.  Plaintiffs testified that when Officer Wolf was at the entryway, he saw their youngest daughter seated on the couch located near the front door.  (See Doc. Nos. 54-7 at 64-65; 54-8 at 97-98.)  Officer Wolf asked if everything was okay and if anyone else was inside the house.  (See Doc. Nos. 54-7 at 65-66; 54-8 at 97.)  Because Plaintiffs' youngest daughter was at home and seen by Officer Wolf while he was standing in the entryway, their son was outside with Mrs. Beam while Officer Wolf was talking to her after leaving the entryway[7], and their oldest daughter was at work, Plaintiffs contend that Officer Wolf had accounted for everyone who could have been in potential distress or danger.  (See Doc. No. 54-7 at 64-65.)  Plaintiffs assert that they "were in completely separate

---

[7]  Although Mrs. Beam testified that her son was outside with her when Officer Rossetti arrived, Mr. Beam testified during his deposition that when Officer Rossetti attempted to handcuff him and followed him into the house, his son "was standing right there.  He came back out of his room."  (Doc. No. 54-8 at 114.)

4

locations when Officer Wolf arrived . . . . [A]nd Wolf saw the younger child watching television in the home before Officer Ros[s]etti arrived." (Doc. No. 61 at 5.) Plaintiff does not address whether Officer Rossetti knew or could have known that all inhabitants of the house were accounted for.

Moreover, Officer Wolf testified that while he was attempting to speak with Mrs. Beam outside of Plaintiffs' home, Mr. Beam continued "to yell and scream," at which point Officer Wolf told him he needed to stop because he could not "talk to his wife Ms. Beam." (Doc. No. 54-9 at 5.) Based on his interactions with Mr. Beam, Officer Wolf advised Officer Rossetti to "step up [his] response." (Doc. No. 54-10 at 12.) Officer Rossetti believed that this meant that he should "get [to the Beam residence] as quickly as possible because something was happening that required [him] to accelerate [his] response time." (Id.) Officer Wolf testified that when Officer Rossetti arrived on the scene, Rossetti did not head immediately to the front steps of the Beam residence. (Doc. No. 54-9 at 7.) Instead, according to Officer Wolf, Rossetti stood alongside Officer Wolf for a minute or two while he was talking to Mrs. Beam. (Id.) Officer Rossetti, on the other hand, testified that he walked towards the Beams' front door "probably five seconds" after he initially left his patrol car.[8] (Doc. No. 54-10 at 19.)

Nonetheless, at this point, Mr. Beam was still standing inside his house behind the screen door. (See id. at 15-16.) Mr. Beam testified that the screen door was closed. (Doc. No. 54-8 at 111.) Officer Wolf, however, testified at his deposition that "[Mr.] Beam was standing in the doorway of the residence holding the screen door open. So that's why he was physically yelling

---

[8] This comports with Mr. and Mrs. Beam's testimony. Mrs. Beam testified that "[w]hen [Officer Rossetti] pulled up [to her house] he literally got right out of his car, didn't say nothing to me or Officer Wolf, walked to my front door, in my house." (Doc. No. 54-7 at 63.) Additionally, Mr. Beam testified that "Officer Rossetti . . . got out [of his car] and walked directly across – high-stepped, like a fast walk, directly across my yard . . . ." (Doc. No. 54-8 at 102-03.)

at me when I advised him to stop, and that's how Patrolman Rossetti was able to see his aggressive manner towards me."  (Doc. No. 54-9 at 7.)  And Officer Rossetti felt that because of Mr. Beam's yelling and his "aggressive stance"—which consisted of him "standing with his arms down at his sides with his fists clenched"—it was "best to detain [Mr. Beam] at that time" for his and Officer Wolf's safety.  (Doc. No. 54-10 at 19-20.)  Officer Rossetti testified at his deposition that he saw Mr. Beam's aggressive stance because Mr. Beam was standing in the doorway.  (Doc. No. 54-10 at 17.)  Because of Mr. Beam's conduct and to prevent him from interfering with the officers' investigation, a decision was made by the officers to handcuff him at that point.  (Id. at 19.)

As Officer Rossetti approached the front door to attempt to handcuff Mr. Beam, Mr. Beam resisted and pulled away, causing him to follow Mr. Beam inside the house.  (See Doc. No. 54-10 at 22.)  Thereafter, Officer Wolf, after talking with Mrs. Beam on the front lawn, entered the Beam residence to assist Officer Rossetti.  (See id. at 22; Doc. No. 54-9 at 8.)  Officer Rossetti leaned Mr. Beam on a couch located near the front door to attempt to handcuff him.  (Doc. No. 54-9 at 8.)  Officer Wolf grabbed one arm while Officer Rossetti grabbed the other.  (Id.)  They testified that Mr. Beam resisted arrest and his resistance led the three men to the Beams' front lawn where Mr. Beam was placed on his chest and secured in handcuffs.  (See id.)  Mr. Beam was then placed in the back of Officer Wolf's patrol car.  (See id.)

Mr. and Mrs. Beam tell a markedly different story.  Mr. Beam states that while Officer Wolf was speaking with Mrs. Beam outside, he remained inside the house, closed both the screen door and the solid door at the front of the house, did not hear the conversation between Officer Wolf and his wife, and remained "completely calm."  (Doc. No. 54-8 at 103, 110-11.)  In addition to testifying that her husband "didn't say two words" from inside the house during her

6

conversation with Officer Wolf, Mrs. Beam also recalled the screen door being closed and the solid door being "half-open, half-closed." (Doc. No. 54-7 at 61-62.) Both testified that Officer Rossetti opened the closed screen door on his own accord and pushed Mr. Beam up against a closet which is located along a wall a few feet from the front door. (See id. at 65; Doc. No. 54-8 at 112.)

And, according to Plaintiffs, despite their assertions that Mr. Beam was not resisting arrest, Officers Wolf and Rossetti told him to stop resisting, dragged him out of the house, and placed him face-down in mud on their front lawn to handcuff him. (See Doc. Nos. 54-7 at 65, 67; 54-8 at 112-13.) Thereafter, as Mr. Beam was being escorted to Officer Wolf's patrol car, he complained to Officers Wolf and Rossetti that the handcuffs were too tight.[9] (See Doc. Nos. 54-8 at 118; 54-7 at 68.) They did not loosen his handcuffs. (See Doc. No. 54-8 at 115.) Mr. Beam claims that his hand injuries were worsened by the ten-minute ride to the police station during which his hands were handcuffed behind his back. (See id. at 116.) After about an hour at the police station, he was released and went home. (See id. at 117.)

As a result of his behavior on February 10, 2018, Mr. Beam was charged with disorderly conduct. (See id. at 117-18.) He pled guilty to the disorderly conduct charge and was fined $1,000. (See id. at 119-21.) He also was charged with resisting arrest and obstructing justice, but those charges were dismissed by a Pemberton Borough municipal judge.[10] (See id. at 120-21; Doc. No. 56 at 10.)

---

[9] Mr. Beam stated that after he was arrested and lifted up from the ground by Officers Wolf and Rossetti, he was "yelling and screaming." (Doc. No. 54-8 at 116.)

[10] Mr. Beam also was charged with obstructing administration of the law. Mr. Beam does not remember this charge and believes he only pled guilty to the disorderly conduct charge. (See id. at 122-23.)

7

### B.       Mr. Beam's Alleged Injuries

Mr. Beam claims that he suffered injuries to his hand because the handcuffs placed on him were too tight.[11]  He testified that he was not injured during Officers Wolf and Rossetti's attempted to arrest him up until when he was handcuffed.  (See Doc. No. 54-8 at 117.)  Rather, he stated that "the handcuffs had everything to do with the injury."  (Id.)  After being handcuffed and while being escorted to Officer Wolf's patrol car, he told Officers Wolf and Rossetti that "they were too tight and they refused to do anything."  (Id. at 118.)  Mr. Beam alleges that the handcuffs were not loosened at all during his ten-minute ride to the police station.  (See id.)  Mr. Beam testified that during the hour he was at the police station, none of the police officers loosened his handcuffs and that "[t]hey thought it was a joke, you know, ha-ha."[12]  (Id. at 118-19.)

After he was released from the police station, Mr. Beam felt "[n]umb.  You know, like if you had a super tight, metal rubber band around your arm."[13]  (Id. at 57.)  Mr. Beam alleges that two days later, he "started getting shooting pains . . . [l]ike electricity going from your palm to your elbow and then from your elbow to your shoulder, to the point where if you're in any

---

[11]  Mrs. Beam's deposition testimony corroborates this claim.  She testified that "I don't think he was injured inside of the home, but he was injured when the handcuffs went on him.  Because he asked, when they put him in the handcuffs, if they could loosen them."  (Doc. No. 54-7 at 68.)  Further, Mrs. Beam testified that, after her husband was placed in Officer Wolf's patrol car, she heard him tell Officer Wolf "[t]he handcuffs are tight.  Can you loosen them?"  (Id. at 69-70.)

[12]  Mr. Beam further testified that he told "every person [he] came in contact with" that his handcuffs were too tight, including a police sergeant who purportedly said:  "In a minute.  We'll get to you in a minute."  (Id. at 56-57.)

[13]  Mr. Beam asserted that he did not immediately seek medical attention because he "figured" that the pins and needles would go away "just like when your arm falls asleep [and] it comes back."  (Id. at 59.)

position other than arm straight down – that's the way you want to go to make the pain recede."
(Id. at 60.)

Plaintiff asserts that because of the injuries he suffered from the tight handcuffs, he went to the emergency room on March 21, 2018 to seek medical care.  (See id. at 47-51.)  This occurred about a month and a half after the February 10, 2018 incident.  Based on medical records referenced during his deposition, Mr. Beam was diagnosed with a forearm sprain and paresthesia.[14]  (Id. at 51.)  On April 23, 2018, he visited a hand specialist.  (See id. at 61.)  On May 4, 2018, the specialist operated on Mr. Beam's hand.  (See id. at 63-64.)  Ten days later, on May 14, 2018, Mr. Beam had a follow-up visit with the specialist, who observed that Mr. Beam "note[d] less numbness and less pain."  (Id. at 65.)  Mr. Beam claims he has a scar at the spot where he has nerve damage, presumably from the surgery.  (See id. at 69.)

### C.    Other Alleged Instances of Harassment of Richard Beam by Defendants

Richard Beam also alleges that the Pemberton Police Department engaged in a pattern of harassment against him over several years, both before and after the February 10, 2018 incident. On October 11, 2017, there was an incident regarding Mr. Beam's motorcycle, which apparently was not returned to him until about two or three months after it was towed from the property of a neighbor who gave Mr. Beam permission to leave it on his front lawn.  (See Doc. No. 54-8 at 135-36, 138.)  Mr. Beam alleges that the police must have had possession of the motorcycle because when he called the tow company, he was informed that the tow company did not have his motorcycle.  (See id. at 138.)  Then, on January 18, 2018, Mr. Beam called 911 after an

---

[14]  Paresthesia is "often described as tingling, numbness, or pins-and-needles."  Nevro Corp. v. Boston Sci. Corp., No. 21-258, 2021 WL 7209369, at *1 (D. Del. Dec. 20, 2021).

unknown man with a firearm shot at him but missed.[15]  (See Doc. No. 56 at 32.)  Officer Rossetti

was dispatched to Mr. Beam's location and attempted to question Mr. Beam as a suspect who

fired the gun.  (See id.)  When Mr. Beam started to walk away, Officer Rossetti allegedly

grabbed his left wrist.  (See id.)  After Mr. Beam broke free, he continued walking away and

Officer Rossetti allegedly yelled something about his badge number.  (See id. at 34.)

Finally, on November 1, 2018, another Pemberton police officer, Officer Laffan, arrested

Mr. Beam while on his way to a hearing for driving with a suspended license.  (See Doc. No. 54-

8 at 139.)  Mr. Beam alleges that Laffan mistook him for a different individual who had an

outstanding warrant.  (See Doc. No. 56 at 11.)  Mrs. Beam arrived on the scene and informed

Officer Laffan that her husband did not have any open arrest warrants.  (See id. at 11.)  Mr.

Beam asked Officer Laffan to drive him the rest of the way to the courthouse where his hearing

was being held.  (See id. at 141.)

### D.     Charles Hentz's Expert Report

In opposing the Motion for Summary Judgment, Plaintiffs rely in part upon an expert

report prepared by Charles Hentz, a retired law enforcement officer with twenty-seven (27) years

of experience, which includes time spent as a lieutenant with the Philadelphia Police

Department.  (See Doc. No. 55-5 at 18.)  Hentz also is licensed under the New Jersey Security

Officer Registration Act to teach individuals who want to become security officers, such as

police officers or security guards, on topics such as use of force, emergency response, and report

---

[15] Mr. Beam testified at his deposition that as he was walking on a street, an unknown man
walked up to him, said "[w]atch it.  They're out there[,]" and then "crack[ed] a shot at [him]."
(Doc. No. 54-8 at 147-48.)  Mr. Beam "believe[s] [the unknown man] was friends [sic] of
somebody on the police."  (Id.)  He then allegedly "went to [the mayor's] office to talk to him
about it and he refused to [speak with him]."  (Id.)

writing.  (See id. at 18-19.)  He was retained by Plaintiffs to provide his expert opinion in this case.

In formulating his opinion, Hentz relied on the internal affairs records on Officers Rossetti, Wolf, and Laffan, internal affairs investigations of Officers Rossetti and Laffan after reported contacts with Mr. Beam, a transcript of the 911 call placed by Plaintiffs' youngest daughter, the Pemberton Police Department's Use of Force Policy and Internal Affairs Policy[16], and incident reports associated with Plaintiffs' interactions with Pemberton police officers.[17]

---

[16] The Use of Force Policy states, in pertinent part:

> Domestic disturbances by design must involve at least two co-antagonists or more.  Officers must be doubly careful when dealing with a situation where both individuals are agitated and angry, first at each other, but their anger can be directed at the police if officers are not careful and diplomatic.  It is advised to always dispatch two (2) officers to a call of this type.  . . .  Best practice is to separate the combatants and take one into a different room in the building, or outside so that each one of them can give their version of the argument or disagreement to an officer without antagonizing the other party.  When co-antagonists are in closer proximity to each other they may try to goad the other party into doing or saying something violent, thereby causing an officer to take more aggressive action to quell the disturbing person and protect himself from harm.  Occasionally one of the suspects will become aggressive toward the police or attempt to attack their co-domestic partner.  Care must be taken when subduing that person because the other person's [sic] partner will turn on the police and attack to protect their partner.  It is permissible for them to assault each other, but when a police officer gets into a fight with their partner they will attempt to intervene.  If an officer can convince one of the domestic antagonists to go outside for a conversation and the other partner refuses to allow an officer into the residence, then best practice is to leave them inside.  The second officer can watch for aggressive activity from a secure location while the first officer interviews the other person.  Without exigent circumstances, or when not invited into a domicile officers should do their best to ascertain that everyone is safe and then depart the area.

(Doc. No. 56 at 39.)

[17] In preparation of his expert report, Hentz also reviewed a demand letter sent to the company that towed Mr. Beam's motorcycle, a towing authorization form sent to the towing company by the Pemberton PD, an answer by the Burlington County Prosecutor's Office sent to Mr. Beam, and the depositions of Officers Wolf and Rossetti.  (See Doc. No. 55-5 at 16.)

(See id. at 16.)  Hentz also provided factual background on the instances of harassment by the

Pemberton Police Department alleged by Plaintiffs.[18]

Specifically, relying on a video purporting to record the February 10, 2018 incident at the

Beam residence, Mr. Hentz opined[19]:

> Officer Rossetti arrived on location slammed the patrol car door and thirteen
> second (13) later after saying "What's Up" to Officer Wolf, who was at least 20
> feet from the front door of [Mr. Beam's] residence, was inside [Mr. Beam's] front
> aluminum storm door yelling for him to "get down, stop resisting, etc.".   The
> police incident report indicates "[Mr. Beam] was standing at his front door with
> his fists clenched in a threatening manner".  Officer Rossetti on video is escorting
> [Mr. Beam] handcuffed behind his back to Wolf[']s patrol vehicle.  [Mr. Beam]
> asked why he was being arrested?  Officer Rossetti said, "you called 911, you
> were freaking out dude, all you would have had to do is come out and talk to us".

(Id. at 6.)

---

[18]  Hentz bases his recitation of the facts on "the documents, reports, and videos provided by the
[Pemberton PD] to [Plaintiff's counsel.]"  (Doc. No. 55-5 at 12.)  For example, Mr. Hentz's
report describes the January 18, 2018 interaction between Mr. Beam and Officer Rossetti,
which presumably was captured by a dashcam installed on Officer Rossetti's patrol car, as
follows:

> Officer Rossetti proceeds to location of reported gun shot.  Notices a man walking
> with traffic coming toward officers' cruiser while officer is going to reported
> gunshot location.  U-turns, drives back to intersection where a white male is
> walking, exits cruiser, calls male to drivers' door location, has a short discussion,
> male starts to walk away, officer Rossetti runs after male, tries to detail male with
> verbiage and a hold on the left wrist of male, male is antagonistic, pulls away
> yells at officer, walks away, and another female officer approaches Rossetti.
> Officers converse, and Officer Rossetti then yells and points toward where white
> male is walking "18717 remember that."  I have no knowledge that either officer
> patrolled area of reported gun shot.  The video of Officer Rossetti indicates he left
> area.  Other officers' cruiser was shown on video following Rossetti's cruiser
> toward initial incident location before Rossetti u-turned and drove to intersection.

(Doc. No. 56 at 34.)

[19]  Hentz's report states that "[o]fficers either turn off their MVR audio or turn on their AM/FM
radio on all the video provided by the PPD."  (Doc. No. 55-5 at 6.)  It is unclear whether this
refers to video captured by bodycams worn by Officers Wolf or Rossetti or by dashcams
installed in their patrol cars.

Based on the February 10, 2018 incident and the other instances of alleged harassment of Plaintiffs by Defendants, Mr. Hentz's report contains the following opinions, titled "**FINAL PROFESSIONAL OPINION**":

1. The Pemberton Police Department (PPD) engaged in a pattern of systematic discriminatory actions over a period of several years against Mr. Richard Beam and Dawn Beam in violation of the #4th, 5th, 14th, Amendments of the Constitution.  They breached their duty of care.

2. The PPD has not followed established police procedures when dealing with Mr. Richard Beam and Dawn Beam as outlined in several U.S. Supreme Court decisions, the New Jersey Attorney General[']s Use of Force (2015) policy, the NJ Crimes Code Title 2C, and the NJ Motor Vehicle Code Title #39.  The officers of the PPD used unnecessary and excessive force when illegally arresting Mr. Richard Beam.

3. PPD Officer Rossetti, Officer Wolf, Officer Laffan, and Officer Swayer [sic] have violated the 4th, 5th, and 14th Amendments to the U.S. Constitution individually and collectively by breaching their duty of care, using unreasonable force, illegally detaining, and executing an illegal arrest, of Mr. Richard Beam.

4. The PPD and the officers violated Pemberton Township Ordinances, and the New Jersey Motor Vehicle Code Title #39.  When dealing with Mr. Richard Beam.

5. The PPD and the officers did over several years engage in a course of conduct that resulting [sic] in a false arrest, the use of illegally and excessive force, wrongful imprisonment, harassment, negligence, and illegal and unreasonable search and seizure.
   . . .

(Doc. No. 55-5 at 4.)  Hentz also includes in the report his interpretations of reasonable police conduct in light of two cases decided by the United States Supreme Court:  Graham v. Connor, 490 U.S. 386 (1989) and Terry v. Ohio, 392 U.S. 1 (1968).  Graham concerns the reasonableness of a police officer's use of force to effect an arrest or other seizure of a citizen.  See Graham, 490 U.S. at 396.  Terry governs the lawfulness of brief investigatory stops and post-stop searches of individuals conducted by police officers.  See Terry, 392 U.S. at 24.

### III.      STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Hart v. Elec. Arts, Inc., 717 F.3d 141, 148 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).   "A dispute 'is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.'" Moody v. Atl. City Bd. of Educ. 870 F.3d 206, 213 (3d Cir. 2017) (citing Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)). A disputed fact "is material only if it might affect the outcome of the suit under governing law." Id.   Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Meditz v. City of Newark, 658 F.3d 364, 369 (3d Cir. 2011) (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).   The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247–249.   Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party.  Id. at 255.   If there is no factual issue, and if only one reasonable

conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.   ANALYSIS

In the Complaint, Plaintiffs allege several federal and state causes of action against Defendants, including violations of their rights under the Fourth and Fourteenth Amendments to the United States Constitution by subjecting them to false arrest, excessive force, and due process violations.  However, before addressing the merits of these and other claims, the Court must consider whether the expert report by Charles Hentz relied upon by Plaintiffs in their Response in Opposition to Defendant's Motion for Summary Judgment is admissible.

### A.   The Opinions of Plaintiffs' Expert Will Be Excluded Because They Are Legal Conclusions on Ultimate Issues

Defendants filed a Motion in Limine to exclude Hentz's report, arguing that (1) his opinions impermissibly provide legal conclusions on ultimate issues of the case and (2) his opinions are "net opinion[s]" unsupported by factual evidence or other data.[20]  (Doc. No. 54 at 4-7.)  Before addressing the merits of Plaintiffs' claims, the Court, for reasons that follow, will exclude as conclusory "legal terms of art" all but factual assertions sourced from the identified records from Mr. Hentz's report.

Federal Rule of Evidence 702 provides:

---

[20] Regarding its contention that Hentz's expert report is "net opinion," Defendants assert that "[a]n expert's bare conclusions, unsupported by factual evidence or other data, are inadmissible as a mere 'net opinion.'"  (Doc. No. 55-2 at 7.)

Defendants cite State v. Townsend, 897 A.2d 316 (N.J. 2006) to support their argument.  Townsend held that the "net opinion rule[] . . . forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or data. . . .  Simply put, the net opinion rule 'requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion.'"  Id. at 329 (citations omitted).

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or likewise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Rule 702 "a trial judge acts as a gatekeeper to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 825, 832 (3d Cir. 2020) (internal quotation marks omitted) (quoting Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008)). "Rule 702 has three major requirements: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." Pineda, 520 F.3d at 244 (citing Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997) (citation omitted)). However, as the Third Circuit explained in Berckeley Inv. Grp., Ltd. v. Colkitt:

> The District Court has discretion to determine whether expert testimony will help the trier of fact. United States v. Agnes, 753 F.2d 293, 303 (3d Cir. 1985), abrogated on other grounds by Smith v. Borough of Wilkinsburg, 147 F.3d 272 (3d Cir. 1998). In utilizing that discretion, however, the District Court must ensure that an expert does not testify as to the governing law of the case. Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that "embraces an ultimate issue to be decided by the trier of fact," an expert witness is prohibited from rendering a legal opinion. United States v. Leo, 941 F.2d 181, 195-96 (3d Cir. 1991). Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury. First Nat'l State Bank v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir. 1981) (per curiam).

455 F.3d 195, 217 (3d Cir. 2006).  "[T]he Third Circuit has held that courts commonly exclude 'legal terms of art' from expert testimony."  United States v. Xue, 597 F. Supp. 3d 759, 772 (E.D. Pa. 2022) (quoting Flickinger v. Toys R Us-Delaware, Inc., 492 F. App'x 217, 224 (3d Cir. 2012)).

Here, in his Report, Hentz uses several legal terms of art, such as "breached," "duty of care," "excessive force," "unreasonable force," "illegal arrest," "false arrest," "wrongful imprisonment," "harassment," "negligence," and "illegal and unreasonable search and seizure." (Id.)  These words are used as legal opinions on several of Plaintiffs' causes of action alleged in this case.[21]  Although Hentz identifies the records he relies on and describes relevant facts from each of them, he draws legal conclusions that embrace ultimate issues to be decided by the trier of fact.  For example, Hentz concludes that Officers Wolf and Rossetti conducted an "illegal and unreasonable search and seizure" on February 10, 2018 when they arrested Mr. Beam, which is a legal conclusion.  (See id. at 6-7.)

---

[21]  Specifically, as noted earlier, Hentz provides the following legal opinions:

> 1.  The Pemberton Police Department (PPD) engaged in a pattern of systematic discriminatory actions over a period of several years against [Plaintiffs] in violation of the 4th, 5th, 14th, Amendments of the Constitution.  They breached their duty of care.
>     . . .
> 3.  PPD Officer Rossetti, Officer Wolf, Officer Laffan, and Officer Swayer [sic] have violated the 4th, 5th, and 14th Amendments to the U.S. Constitution individually and collectively by breaching their duty to care, using unreasonable force, illegally detaining, and executing an illegal arrest, of Mr. Richard Beam.
>     . . .
> 5.  The PPD and the officers did over several years engage in a course of conduct that resulted in a false arrest, the use of illegal and excessive force, wrongful imprisonment, harassment, negligence, and illegal and unreasonable search and seizure.

(Doc. No. 55-5 at 4.)

In addition, Hentz, apparently relying upon recordings made from Officer Wolf's or Rossetti's patrol car, states that Officer Rossetti arrived on the scene, exited his vehicle, and asked "what's up?" to Officer Wolf.  (Id. at 7.)  Then, "[t]he door to the house slams exactly 13 seconds later," Mr. Beam tells Officer Rossetti to "get the fuck out of my house," and Officer Rossetti says "show me your freaking hands, down on the floor, stop resisting."  (Id.)  The Report goes on to state "[t]he yelling continues until Beam and Rossetti come into view and Beam asked why you came into his house?  Ros[s]etti said 'you called 911, you were freaking out dude, all you had to do is come out and talk to us'."  (Id.)

Hentz then cites the Supreme Court's decision in Graham v. Connor as the standard applicable to assessing excessive force claims and offers his opinion based on Graham as to the reasonableness of an investigative detention, which is a legal conclusion.  In this regard, the opinions contained in his report would usurp the Court's "pivotal role in explaining the law to the jury."  Berckeley, 455 F.3d at 217 (citing First Nat'l State Bank, 668 F.2d at 731).  He forms legal opinions in other regards on the governing law of the case.  For these reasons, the Motion in Limine will be granted as to Hentz's legal conclusions on the applicable law.[22]

## B.   Plaintiffs' Monell Claims Against Defendants Township of Pemberton and Township of Pemberton Police Department

In Count I, Plaintiffs allege that Defendant Township of Pemberton, through its police department and its individual police officers, had a policy or custom of permitting its employees to engage in unconstitutional activity, such as using excessive force to effectuate arrests, entering

---

[22] Two other opinions are offered by Hentz.  In the second opinion, which is quoted supra, the last sentence of the opinion is a legal conclusion.  The balance of the second and fourth opinions are not legal conclusions on ultimate issues in the case.

residences without a warrant, and violating their due process rights, all under 42 U.S.C. § 1983.[23]

(See Doc. No. 1 at 7-8.)  They further allege that the Township exhibited deliberate indifference to these constitutional violations.  (See id. at 8.)  Defendants deny this claim, asserting that at the summary judgment stage, the non-movant Plaintiffs have not produced evidence to show a genuine dispute of material fact on their alleged claims.[24]

Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

---

[23] To the extent Plaintiffs allege that the Pemberton PD is liable for its officers' allegedly unconstitutional actions under § 1983, summary judgment will be granted in its favor since it is not a proper party under § 1983.  In Benjamin v. E. Orange Police Dep't, the United States District Court for the District of New Jersey stated that:

> It is well-established in this Circuit that courts "treat [a] municipality and its police department as a single entity for purposes of section 1983 liability."  See Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997).  For this reason, "[p]olice departments cannot be sued alongside municipalities because a police department is merely an administrative arm of the municipality itself."  Hernandez v. Borough of Palisades Park Police Dep't, 58 Fed. App'x 909, 912 (3d Cir. 2003).  When a Section 1983 action has been brought against a municipality and a police department, the police department must be dismissed, as "it is to the municipality that any liability must flow."  . . .

937 F. Supp. 2d 582, 590 (D.N.J. 2013); see also Moore v. Pennsylvania, 2022 WL 7375509, at *1 (3d Cir. Oct. 13, 2022) ("[M]unicipal police departments . . . are governmental sub-units that are not distinct from the municipalities of which they are a part, . . . and thus may not be separately sued under § 1983.") (citation omitted); Adams v. City of Camden, 461 F. Supp. 2d 263, 266 (D.N.J. 2006) ("In New Jersey a municipal police department is not an entity separate from the municipality, N.J. Stat. Ann. § 40A:14-118 . . . .").  Accordingly, summary judgment will be granted on Counts I to IV and on Count VI in favor of Defendant Pemberton PD.

[24] Although unclear in the Complaint, it appears that Count II alleging municipal and supervisory liability refers to the claims raised in Count I.

42 U.S.C. § 1983.  Generally, "[m]unicipalities cannot be held liable under § 1983 based solely upon a theory of respondeat superior."  Kelly v. Borough of Carlisle, 622 F.3d 248, 263 (3d Cir. 2010).  Respondeat superior holds employers liable for their employees' negligent acts "'solely on the basis of the existence of an employer-employee relationship,' regardless of whether the employer had any part in causing the harm."  Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir. 2010) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978)).

However, in Monell, the United States Supreme Court held that municipal entities can be subject to § 1983 liability in limited circumstances.  436 U.S. at 690.  Under Monell, to state a § 1983 claim against a municipality, a plaintiff must establish that (1) a constitutionally protected right has been violated, and (2) the alleged violation resulted from a municipal policy, custom, or deliberate indifference.   See id. at 694-95; Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990).

The gravamen of Monell and its progeny is that "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered."  Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986).  In other words, the constitutional deprivation must have its origin in the policy, custom, or deliberate indifference of the municipality, and liability based on the actions of city officials exists only where it can be shown that the officials acted in accordance with that policy, custom, or deliberate indifference.  See Monell, 436 U.S. at 694.  As the Third Circuit explained in Forrest v. Parry:

> [A] § 1983 claim against a municipality may proceed in two ways.  A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that "reflects a deliberate or conscious choice."

930 F.3d 93, 105 (3d Cir. 2019) (internal citations omitted).

20

### 1.   Plaintiffs Fail to Identify a Township Policy or Custom

Regarding Plaintiffs' claims against the Township and the Pemberton PD, Plaintiffs must adduce sufficient evidence at the summary judgment stage to show that the alleged constitutional violations were caused by a municipal policy, custom, or deliberate indifference.  See Monell, 436 U.S. at 694-95.  There are several ways a plaintiff may establish the existence of a municipal policy or custom to establish municipal liability under Monell.  For example, a plaintiff may cite to an official policy.  See id. at 690 (holding that a municipality may be sued under Section 1983 when it "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"); see also Kelly, 622 F.3d at 263 ("'Policy' includes official proclamations made by municipal decisionmakers with final authority . . . ."). In addition, a policy also may exist where a municipality delegates to its employees the authority to set policy or where it ratifies actions taken by employees without policymaking authority.  See id. at 264.  Here, it is undisputed that Plaintiffs identify no official policy statement showing that Township police officers can utilize excessive force or enter citizens' homes without a warrant or violate due process rights.[25]

A plaintiff also may establish municipal liability under Monell by identifying a custom. Custom, unlike policy, "is defined as practices of state officials . . . so permanent and well settled as to virtually constitute law."  Id. (citing Berg v. Cnty. of Allegheny, 219 F.3d 261, 275 (3d Cir.

---

[25]  Rather, the only official policy identified is the Pemberton PD's Use of Force Policy (2010), which is included in Hentz's report.  (See Doc. No. 56 at 38-39.)  This policy, far from condoning excessive force, cautions that police officers responding to potential domestic disturbances should be "doubly careful" and should make sure that the two "co-antagonists" are spoken to in separate locations "so that one of them can give their version of the argument or disagreement to an officer without antagonizing the other party."  (Id. at 39.)  Viewing the evidence in the light most favorable to Plaintiffs at the summary judgment stage only, Officer Rossetti's decision to attempt to enter the Beam residence and attempt to detain him violated the Use of Force Policy.  The Policy therefore was not the cause of Officer Rossetti's allegedly unconstitutional actions.

2000)).   While a custom does not have the force of law, it constitutes a "de facto policy or practice."   See Chey v. Labruno, No. 20-19036, 2022 WL 2188034, at *13 (D.N.J. June 17, 2022).   A custom can be established by identifying "other comparable situations or incidents" in which the Pemberton Police Department's (the "Pemberton PD") "alleged practices resulted in injuries to other individuals."   Id.; see also Adams v. City of Atl. City, 294 F. Supp. 3d 283, 302-03 (D.N.J. 2018) (finding a genuine dispute of material fact as to custom where a plaintiff adduced sufficient evidence that the municipality was aware of a high number of complaints of excessive force and did not investigate them or discipline the responsible officers).   However, "at summary judgment a non-moving party may not rest on mere allegations."   Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 193-94 (3d Cir. 2009) (citing Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992)).

Here, Plaintiffs' Complaint alleges that:

The Township of Pemberton, and it's [sic] Chief of Police and employees, have been aware for some time, from lawsuits, notices of claim, complaints previously filed, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of his police officers use excessive force, unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of his fellow officers. Nevertheless, the Township of Pemberton has allowed policies and practices that allow the aforementioned to persist.
. . .
For example, the well documented failures of the Township and Police Department, to substantiate obviously citizen complaints have gone uncorrected. The Township of Pemberton regularly finds complainants lack credibility based on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to them.   In addition, the Township of Pemberton virtually never initiates his own findings of false statements against officers who have made false statements to the Township of Pemberton in his own defense, nor do they initiate findings that officers have failed to report his fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully.  . . .

The Pemberton Township Police, once receiving a substantiated complaint by the City, fails to adequately discipline officers for misconduct.  The Township Police Department Advocate or Investigator, which is endowed with the responsibility of following up on substantiated Township of Pemberton charges, is understaffed and under-utilized.  . . .

(Doc. No. 1 at 8-9.)  These practices, Plaintiffs allege, are so permanent and well-settled within the Township of Pemberton that they "virtually constitute[] law." Kelly, 622 F.3d at 263.  These statements, however, are conclusory.[26]

Here, the record is devoid of facts outlining the Township's processing and handling of excessive force complaints made against Officer Wolf or Officer Rossetti.  Plaintiffs only make vague assertions about citizen complaints of excessive force and the laxness of the Township in investigating them and disciplining the officers.   As the Third Circuit noted in Chambers, Plaintiffs cannot, at the summary judgment stage, "rest on mere allegations."  587 F.3d at 193 (citation omitted).  In sum, Plaintiffs have not identified practices by the Pemberton PD that are so permanent and well-settled as to constitute a Township policy or custom.

---

[26] In Noble v. City of Camden, the plaintiff produced:

expert evidence that the two Defendant officers in this case had previously accumulated 19 complaints against them for use of excessive force; that the officers had been flagged for monitoring and supervision in 2004 and 2005; and that past complaints against the officers had not been timely or properly investigated.

112 F. Supp. 3d 208, 223-24 (D.N.J. 2015).

Similarly, the court in Garcia v. City of Newark denied the defendants' summary judgment motion where "the proof here includes specific evidence of actual written civilian complaints against individual defendant police officers. . . .  In addition, six of the individual defendants together account for more than 55 complaints of similar misconduct [for excessive force and false arrest] . . . ."  Civil No. 08-1725, 2011 WL 689616, at *4 (D.N.J. Feb. 16, 2011).

As discussed supra, Plaintiff does not point to evidence of written complaints or of any Township policy that outlines how it handles excessive force complaints.

### 2.     Plaintiffs Also Fail to Show Deliberate Indifference by the Township

While Plaintiffs have not identified a municipal policy or a municipal custom, they also may establish the Township's liability for its employees' allegedly unconstitutional conduct by showing that it was deliberately indifferent to violations of constitutional rights.  When plaintiffs allege that the "custom at issue is a failure to train or supervise," as Plaintiffs allege here, they "must show that this failure 'amounts to deliberate indifference to the rights of persons with whom [the municipality's] employees will come into contact.'"  Johnson v. City of Phila., 975 F.3d 394, 403 (3d Cir. 2020) (internal quotation marks omitted) (quoting Thomas v. Cumberland Cnty., 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted)).

### a.     Failure to Train

Plaintiffs have not raised a genuine dispute of material fact that any claimed failure to train amounted to deliberate indifference.   Under the failure-to-train avenue of deliberate indifference, the United States Supreme Court has explained:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.  But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

City of Canton v. Harris, 489 U.S. 378, 390 (1989).

And although it is true that "a pattern of similar constitutional violations by untrained employees is ordinarily necessary" to make out a failure to train claim under Monell, the need for training in a given situation may be "so obvious" that failure to do so amounts to an unconstitutional policy "even without a pattern of constitutional violations."  Davis v. City of Phila., 284 F. Supp. 3d 744, 756 (E.D. Pa. 2018) (quoting Thomas, 749 F.3d at 223).

24

In the Third Circuit, a plaintiff can establish deliberate indifference sufficient to survive summary judgment by offering facts that show the following:

> (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.

Forrest, 930 F.3d at 106 (citing Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999)).

The existence of the Use of Force Policy satisfies the first element—whether municipal policymakers know that employees will confront a particular situation. Clearly, municipal policymakers knew that Pemberton police officers would respond to and investigate potential domestic disputes during the course of their duties since the Pemberton PD's Use of Force Policy specifically addresses the most prudent course of action in this situation. Arguably, with respect to the second element, a reasonable jury could find that responding to domestic disturbances involves a difficult choice, especially when coupled with the Use of Force Policy's words of caution to ensure that both co-antagonists are accounted for so that fights between them or involving the officers do not ensue.

However, Plaintiffs fail to sufficiently allege here the third element of deliberate indifference—an employee's wrong choice will frequently cause deprivation of constitutional rights. At this stage, viewing the facts alleged in the light most favorable to Plaintiffs, there is no evidence suggesting that responding to domestic disturbances will "frequently" result in violations of citizens' constitutional rights. No instances similar to the one encountered by Plaintiffs is alleged such that it would put the Township on notice that responding to domestic disturbances poses a special risk for potential constitutional violations. And this is not a case where the need for training regarding domestic disturbance situations is "so obvious" that failure to do so amounts to an unconstitutional policy "even without a pattern of constitutional

violations." Davis, 284 F. Supp. 3d at 756 (citing Thomas, 749 F.3d at 223).   Accordingly, Plaintiffs' allegations lack sufficient evidentiary support to raise a genuine dispute of material fact to conclude that Defendant Township of Pemberton was deliberately indifferent to their constitutional rights due to a failure to train its employees.

### b.      Failure to Supervise

Plaintiffs also fail to raise a genuine dispute of material fact regarding the Township's deliberate indifference on a failure to supervise theory.   In Count II, Plaintiffs claim that the Township also is liable under § 1983 because it failed to supervise its officers as a result of its decision to not adequately investigate complaints made by citizens about its police officers.   In Merman v. City of Camden, the court denied summary judgment where the plaintiff produced "copies of Internal Affairs' statistical summaries for each year between 1999 and 2005," which indicated that "Internal Affairs received more than four hundred and seventy (470) complaints of excessive force and approximately sixty (60) complaints of improper arrest during that period of time . . . ."   824 F. Supp. 2d 581, 590 (D.N.J. 2010).   The court went on to contrast the investigative system in place by Camden with Pittsburgh's investigative system described in Beck v. Pittsburgh, 89 F.3d 966 (3d Cir. 1996):

> [T]he plaintiff [in Beck] offered into evidence several investigative reports conducted by the municipality's investigative agency in connection with civilian complaints, including the plaintiff's own, against Officer Williams for the use of excessive force.   [Beck, 89 F.3d 966,] 969-70 [(3d Cir. 1996)].   None of the complaints were sustained or resulted in discipline for Officer Williams.   Id. at 970.   In addition, the plaintiff presented the testimony of municipal officials who explained that the municipality treats each complaint against an officer as an independent event and does not consider an officer's history of prior, unsustained complaints when evaluating a pending one.   Id. at 969.   Finally, the plaintiff also introduced a municipal report that contained statistical information regarding excessive force complaints and acknowledged the department's problems with excessive force and its remedial procedures.   Id. at 970, 975.

Merman, 824 F. Supp. at 590.

26

In <u>Merman</u>, however, despite the extensive records of civilian complaints contained in Internal Affairs reports identified by the plaintiff, the court did not conclude that the municipality had exhibited deliberate indifference to the plaintiff's constitutional rights based solely on the statistical evidence.  Rather, it stated that "a Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one." <u>Id.</u> at 591 (quoting <u>Brown v. New Hanover Twp. Police Dep't</u>, Civil No. 07-2776, 2008 WL 4306760, at *15 (E.D. Pa. Sept. 22, 2008)) (internal quotation marks and citation omitted).

Here, by contrast, viewing the facts in the light most favorable to Plaintiffs, there is no evidence that would permit a reasonable jury to conclude that Defendant Township of Pemberton was deliberately indifferent to Plaintiffs' constitutional rights for failure to supervise its police officers.  Plaintiffs have not adduced any evidence supporting their conclusory allegations that the investigatory procedures are inadequate and do not present any statistics or comparisons regarding excessive force or false arrest or imprisonment complaints against the Pemberton PD or its officers.  Furthermore, Plaintiffs do not identify prior "lawsuits, notices of claim, complaints previously filed, and judicial ruling suppressing evidence and finding officers incredible as a matter of law . . . ."  (Doc. No. 1 at 8.)  Without this information, a reasonable jury does not have a sufficient evidentiary basis upon which to conclude that "those prior incidents deserved discipline," whether those instances were factually similar to those alleged by Plaintiffs, or whether there was a failure to supervise.  Accordingly, Plaintiffs have not raised a genuine dispute of fact regarding the Township's deliberate indifference to their constitutional rights under a failure to supervise theory.

27

c.      **Failure to Investigate**

Plaintiffs similarly fail to raise a genuine dispute of material fact that the Township was deliberately indifferent to their constitutional rights by failing to investigate alleged claims of excessive force against its police officers.    Plaintiffs allege that Defendant Township of Pemberton is liable under Monell because it is deliberately indifferent to their constitutional rights through a failure to "properly investigate" claims against officers of the Pemberton PD. (Doc. No. 56 at 18-19.)    Rather, they assert that "[i]f you are under suspicion in Pemberton Township you can expect that the Police will use various tactics to exact revenge on people they do not like by using excessive force, false arrests, and improper Internal Affairs sham investigations."   (Id. at 18.)   In support of their contentions, Plaintiffs rely upon Hentz's report describing his review of different Internal Affairs ("IA") investigations of Officers Laffan, Rossetti, and Sawyer regarding their involvement in other instances of alleged harassment of Plaintiffs independent of the February 10, 2018 domestic disturbance incident.   (See Doc. No. 55-5 at 8-10.)

But "[i]t is well-settled within the Third Circuit 'that an allegation of a failure to investigate, without another recognizable constitutional right, is not sufficient to sustain a section 1983 claim.'"   Belt v. Fed. Bur. of Prisons, 336 F. Supp. 3d 428, 439 (D.N.J. Sept. 17, 2018) (internal quotation marks omitted) (citing Graw v. Fantasky, 68 F. App'x 378, 383 (3d Cir. 2003) (citation omitted); Sanders v. Downs, 420 F. App'x 175, 180 (3d Cir. 2011); Aruanno v. Fishman, 443 F. App'x 679, 680-81 (3d Cir. 2011)).

As to Plaintiffs' excessive force and unlawful entry claims under the failure to investigate rubric, "they must show that there existed within" the Township "a widespread pattern of deliberate indifference to credible allegations" of excessive force and warrantless entries into

homes.  Does v. Se. Delco Sch. Dist., 272 F. Supp. 3d 656, 675 (E.D. Pa. 2017).  Plaintiffs, however, as noted supra, have not identified specific instances that would place the Township on notice that there existed within the Pemberton PD a pattern of excessive force or warrantless entry complaints.  The same is true for their due process claims.  For these reasons, Plaintiffs' failure to investigate claim fails as a matter of law.

In conclusion, because Plaintiffs have not identified a policy, custom, or deliberate indifference by the Defendant Township of Pemberton that caused the alleged unconstitutional actions described in the Complaint, the Township is not liable under Monell for the Section 1983 claims in Counts I to IV and Count IX.  Accordingly, summary judgment on Plaintiffs' claims in Counts I to IV and Count VI will be entered in favor of Defendants Township of Pemberton.[27]

---

[27] Count IV asserts a claim for a "constitutional tort."  Specifically, Plaintiff alleges that "Defendants, acting under color of law, intentionally or recklessly violated plaintiffs' rights pursuant to §§ 5, 6, and 12 of the New Jersey State and U.S. Constitution."  (Doc. No. 1 at 10.)  Count IV seems to allege state and federal constitutional violations under § 1983.  Section 1983 only applies to federal constitutional violations.  It does not appear that there are any federal constitutional violations alleged in Count IV, despite the reference to the provisions of the "U.S. Constitution."  The Fifth, Sixth, and Twelfth Amendments of the U.S. Constitution do not apply here.

Even giving Plaintiffs the benefit of the doubt, they do not allege causes of action under the New Jersey Constitution.  Although the New Jersey Constitution refers to Articles and Paragraphs rather than Sections, it appears that Plaintiffs are referring to Article I, which is titled "Rights and Privileges," since that is the only article of the New Jersey Constitution that has at least twelve Paragraphs.  However, Paragraphs 5, 6, and 12 of Article I refer to "[d]iscrimination based on religion, ancestry and national origin," "[f]reedom of speech and the press," and "[r]ight against excessive bail; right against cruel and unusual punishment," respectively.  N.J. Const. art. I.  Here, Plaintiffs do not allege any discrimination based on religion, ancestry, or national origin, nor do they assert any violations of free speech.  In addition, the Complaint does not allege that Plaintiffs were subjected to cruel and unusual punishment.  Thus, summary judgment on Count IV will be granted in favor of all Defendants.

And as Defendants correctly note, there is no cognizable claim for respondeat superior as asserted in Count VI.  Monell held that municipalities may not be held vicariously liable for the acts of its employees and, as noted supra, the Township is not liable under Monell because

### C.   Section 1983 Claims Against Individual Defendants: Qualified Immunity

The Individual Defendants argue that they are cloaked with qualified immunity and therefore the federal claims should be dismissed against them.   In Clark v. Coupe, the Third Circuit explained the doctrine of qualified immunity:

> "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Peroza-Benitez v. Smith, 994 F.3d 157, 165 (3d Cir. 2021) (internal quotation marks omitted) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)) (per curiam).   In assessing whether qualified immunity was properly granted, we engage in a two-part analysis: (1) whether the plaintiff sufficiently alleged a right had been violated, and (2) whether that right was clearly established when it was allegedly violated to the extent "that it would have been clear to a reasonable person that his conduct was unlawful." Williams[ v. Sec'y Pa. Dep't of Corrs.], 848 F.3d [549,] 557 [(3d Cir. 2017)].

55 F.4th 167, 178 (3d Cir. 2022).[28]   Because "[c]ourts may begin their [qualified immunity] inquiry with either prong," "[a]n answer in the negative to either prong entitles an officer to qualified immunity." Peroza-Benitez, 994 F.3d at 165 (citations omitted); see also Pearson v. Callahan, 555 U.S. 223, 236 (2009) (holding that "judges in the district court . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

The Third Circuit has explained this prong of the qualified immunity doctrine as follows:

> "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates

---

Plaintiffs failed to survive summary judgment by demonstrating the existence of a Township policy, custom, or deliberate indifference.  Thus, summary judgment on Count VI also will be granted in Defendants Township of Pemberton's favor.

[28] "At summary judgment, the burden is on the officer to establish an entitlement to qualified immunity." Peroza-Benitez, 994 F.3d at 165 (citing Halsey v. Pfeiffer, 750 F.3d 273, 288 (3d Cir. 2014)).

that right." L.R. v. Sch. Dist. of Phila., 836 F.3d 235, 248 (3d Cir. 2016) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted). "The ultimate question is whether the state of the law when the offense occurred" gave [the government officials] "fair warning" that their conduct violated [the plaintiff's constitutional rights]. Id. at 247 (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

To determine whether such "fair warning" existed, we search first for "factually analogous" cases in the Supreme Court, and then turn our inquiry to whether "binding opinions from our own Court" were in existence. Peroza-Benitez, 994 F.3d at 165 (citing Fields v. City of Phila., 862 F.3d 353, 361 (3d Cir. 2017)). If neither source provides relevant caselaw, we consider whether "a robust consensus of cases of persuasive authority in the Court of Appeals could clearly establish a right for purposes of qualified immunity." L.R., 836 F.3d at 248. Finally, "[w]e may also take into account district court cases, from within the Third Circuit or elsewhere." Peroza-Benitez, 994 F.3d at 166 (citing L.R., 836 F.3d at 248).

Clark, 55 F.4th at 181.

The United States Supreme Court has recognized that "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting Mullenix, 577 U.S. at 18). However, "'precise factual correspondence' between the case at issue and a previous case" is not required. Peroza-Benitez, 994 F.3d at 166 (quoting Kopec v. Tate, 361 F.3d 772, 778 3d Cir. 2004)) (citation omitted). As the Supreme Court explained in Hope v. Pelzer:

[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful[.]'

536 U.S. at 741 (internal quotation marks omitted) (quoting United States v. Lanier, 520 U.S. 259, 269 (1997) (citation omitted)); see also Clark, 55 F.4th at 182 ("[S]tate officials can still receive fair warning that their conduct is violative even in 'novel factual circumstances' never

31

previously addressed in caselaw.") (quoting <u>Hope</u>, 536 U.S. at 741).  Put differently, "existing

precedent must have placed the statutory or constitutional question beyond debate."  <u>Ashcroft</u>,

563 U.S. at 741.  "A public official does not get the benefit of 'one liability-free violation' simply

because the circumstance of his case is not identical to that of a prior case."  <u>Peroza-Benitez</u>, 994

F.3d at 166 (quoting <u>Kopec</u>, 361 F.3d at 778) (citation omitted).

"Before searching for relevant caselaw, however, we must first identify the specific right

[the plaintiff] alleged was violated."  <u>Clark</u>, 55 F.4th at 181.  As the court in <u>Clark</u> explained:

> Defining the contours of the right is critical to determining whether it was clearly
> established; we must define the right "at the appropriate level of specificity."
> <u>Sharp v. Johnson</u>, 669 F.3d 144, 159 (3d Cir. 2012).  "This requires us to frame
> the right 'in light of the specific context of the case, not as a broad proposition.'"
> <u>Peroza-Benitez</u>, 994 F.3d at 165 (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201
> (2001)).  We define the right with specificity because only then can we determine
> whether "the violative nature of the [officials'] <u>particular</u> conduct is clearly
> established."  <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015) (per curiam).  We turn
> then to the complaint and the specific facts surrounding the alleged violation.

55 F.4th at 181-82 (emphasis in original).

As noted <u>supra</u>, Plaintiffs assert three separate federal constitutional claims against the

Individual Defendants that implicate qualified immunity:  (1) unreasonable search by entering

their home without a warrant or under an exception to the warrant requirement (Count I); (2)

excessive force (Count I); and (3) violations of their procedural due process protections under the

Fourteenth Amendment (Count I).  As discussed in further detail below, Defendants are entitled

to summary judgment on qualified immunity grounds on Counts I and III, but they are not

entitled to qualified immunity on Count II.

### 1.    Count I:  Unlawful Entry

Count I alleges first that Officer Rossetti unlawfully entered Plaintiffs' home to arrest Mr.

Beam because Rossetti did not have a warrant and was not acting pursuant to an exception to the

warrant requirement.  Here, viewing the facts in the light most favorable to Mr. Beam, he asserts that both the screen door and the front door were closed before Officer Rossetti arrived on the scene and that he only opened the front door after Rossetti pulled up to the residence.  (See Doc. No. 54-8 at 111.)  Mr. Beam testified that he was completely calm and never raised his voice up until the time he was outside of his house where he was handcuffed.  (See id. at 99.)  However, it is undisputed that Officer Wolf told Rossetti to step up his response time, a request Rossetti understood to mean "[t]o get [to the scene] as quickly as possible because something was happening that required [him] to accelerate [his] response time."  (Doc. Nos. 54-9 at 5; 54-10 at 12.)  Moreover, contrary to Mr. Beam's testimony, Officer Rossetti testified at his deposition that Mr. Beam "had been yelling" and "was standing at the door . . . with his arms down at his sides with his fists clenched."  (Doc. No. 54-10 at 19-20.)  In any event, Rossetti corroborates Mr. Beam's testimony that he was in public view at the front door.  (Id. at 14, 17.)

According to Mr. Beam, Officer Rossetti, within seconds of his arrival, went up to his front door, "grabbed hold of [his] screen door and opened it and then pushed [the] other door open."  (Doc. No. 54-8 at 111.)  When Officer Rossetti opened both doors and entered the Beam residence, Mr. Beam was standing "in close vicinity to where [Rossetti] entered."  (Id.)

Therefore, based upon the evidence submitted and viewing the facts in the light most favorable to Plaintiffs, the constitutional right at issue here is:  whether a police officer who is responding to a domestic emergency violates the Fourth Amendment when he enters a home to control a spouse standing in plain view at the threshold of an open front door whom he believes caused the emergency.

The Court will begin its qualified immunity analysis with the second prong, which asks whether the constitutional right allegedly violated was clearly established at the time of its

violation.  See Pearson, 555 U.S. at 236; Peroza-Benitez, 994 F.3d at 165.  Although there is no factually analogous precedent on the constitutional right at issue here from the United States Supreme Court, three Supreme Court decisions, United States v. Watson, United States v. Santana, and Payton v. New York provide a valuable starting point.

In Watson, the Court held that an officer does not need a warrant to arrest someone in a public place upon probable cause.  423 U.S. 411, 423-24 (1976).[29]  Moreover, the threshold of a property is considered a "public" place under the Fourth Amendment and individuals, therefore, do not have a reasonable expectation of privacy where they are "as exposed to public view, speech, hearing, and touch as if [they] had been standing completely outside [their] house." United States v. Santana, 427 U.S. 38, 42 (1976).

In Santana, officers arranged a drug transaction by providing cash to an individual to purchase illicit drugs from the defendant at her home.  Id. at 39-40.  After the individual purchased the drugs from the defendant, officers went to the defendant's home where they found her standing in the doorway with a brown paper bag in her hand.  Id. at 40.  They "pulled up to within 15 feet of [the defendant,] . . . got out of their van," shouted "police," and displayed their badges.  Id.  "As the officers approached, Santana retreated into the vestibule of her house."  Id.

---

[29] Although the Supreme Court in Watson stated that law enforcement officers' "judgments about probable cause may be more readily accepted where backed by a warrant issued by a magistrate," it declined to hold that the Fourth Amendment requires officers to obtain a warrant for an arrest made in public

> when the judgment of the Nation and Congress has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like.

423 U.S. at 423-24.  However, Watson did not address "the still unsettled question" of "whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest."  Id. at 418 n.6.

The officers followed her into her home, arrested her, and seized the cash supplied to the individual by the undercover officer.  Id. at 40-41.  The Supreme Court held that under these circumstances, the officers' entry into the home and arrest of the defendant did not violate the Fourth Amendment.  Id. at 43.  Specifically, the Court stated:

> While it may be true that under the common law of property the threshold of one's dwelling is "private," as is the yard surrounding the house, it is nonetheless clear that under the cases interpreting the Fourth Amendment Santana was in a "public" place.  She was not in an area where she had any expectation of privacy.  "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. 347, 351 (1967).  She was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house.  Hester v. United States, 265 U.S. 57, 59 (1924).  Thus, when the police, who concededly had probable cause to do so, sought to arrest her, they merely intended to perform a function we have approved in Watson.
>
> The only remaining question is whether her act of retreating into her house could thwart an otherwise proper arrest.  We hold that it could not.  In Warden v. Hayden, 387 U.S. 294 (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons.  This case, involving a true "hot pursuit," is clearly governed by Warden; the need to act quickly here is even greater than in that case while the intrusion is much less. . . . The fact that the pursuit here ended almost as soon as it began did not render it any the less a "hot pursuit" sufficient to justify the warrantless entry into Santana's house.
>
> We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper under Watson, by the expedient of escaping to a private place.

Id. at 42-43.[30]

Four years after Santana was decided, the Supreme Court issued its decision in Payton v.

New York, 445 U.S. 573 (1980).  In Payton, detectives went without a warrant to the apartment

---

[30]  The Third Circuit, relying on Santana, also held that "many places designated as 'private' by the common law of property do not garner Fourth Amendment protection because they have been knowingly exposed to public view and lose a legitimate expectation of privacy."  United States v. Correa, 653 F.3d 187, 191 (3d Cir. 2011) (citing Santana, 427 U.S. at 42).

of the defendant, a suspect in a murder investigation, at 7:30 a.m. and knocked on the front door. Id. at 576.  No response was received.  Id.  A half-hour later, the detectives broke open the door using crowbars and entered the apartment.  Id.  The defendant was not home, but while inside his apartment the detectives found and seized a bullet casing that was in plain view.  Id. at 576-77. In this situation, the Supreme Court held that:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home – a zone that finds its roots in clear and specific constitutional terms:  "The right of the people to be secure in their . . . houses . . . shall not be violated."  That language unequivocally establishes the proposition that "[at] the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."  Silverman v. United States, 365 U.S. 505, 511.  In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

Id. at 589-90.  In Payton, the Supreme Court remanded the case for further proceedings to address whether exigent circumstances justified the detectives' warrantless entry into the defendant's apartment.  Id. at 603.

Although there is no factually analogous Third Circuit precedent, the Third Circuit has noted that "[i]t is settled law that a defendant standing on the threshold of his dwelling is in a 'public' place for Fourth Amendment purposes."  Gov't of the V.I. v. Clarke, 572 F. App'x 138, 141 (3d Cir. 2014) (citing Santana, 427 U.S. at 42).  In Clarke, the Third Circuit held that the lower court did not err in concluding that the defendant "was not entitled to the increased Fourth Amendment protection afforded to individuals in their homes" when he "was arrested in the doorway of his home while 'peeping out' at the officers."  Id.

However, the Third Circuit has not addressed what other Courts of Appeals describe as "threshold arrests" or "across the threshold arrests."  An "across the threshold arrest" occurs

where the police are outside an individual's front door and they decide to arrest the individual

while he or she is standing inside their home but still within the officer's reach.  See, e.g., United

States v. Allen, 813 F.3d 76, 82 (2d Cir. 2016) (stating that an "across the threshold" arrest occurs

"where law enforcement officers have summoned a suspect to the door of his home, . . . he

remains inside the home's confines," and the officers then arrest him); Washington v. Tobeck,

No. 08-181, 2010 WL 11515682, at *3 (M.D. Fla. Jan. 20, 2010) (explaining that a threshold

arrest occurs where "police officers reach inside a suspect's home to arrest him when the suspect

is standing at the threshold of the home's front door").

Moreover, there is a split among several Courts of Appeals regarding whether the Fourth

Amendment is violated when officers physically enter the home or when the arrest is made at or

near the threshold.  Compare Knight v. Jacobson, 300 F.3d 1272, 1274 (11th Cir. 2002) (holding

that officer did not violate Payton "when an officer arrests a suspect who has stepped outside his

home at the officer's command"), United States v. Berkowitz, 927 F.2d 1376, 1386-88 (7th Cir.

1991) (holding there is no Fourth Amendment violation "where the police go to a person's home

without a warrant, knock on the door, announce from outside the home the person is under arrest

when he opens the door to answer, and the person acquiesces to the arrest"), and United States v.

Carrion, 809 F.2d 1120, 1128 (5th Cir. 1987) (concluding there was no Payton violation where

law enforcement officers drew their weapons on a suspect after he opened his hotel room door

because, in part, he "had no protectible expectation of privacy at the open door to his hotel

room"), with Allen, 813 F.3d at 85 ("We therefore hold that irrespective of the location or

conduct of the arresting officers, law enforcement may not cause a suspect to open the door of

the home to effect a warrantless arrest of a suspect in his home in the absence of exigent

circumstances."), Fisher v. San Jose, 558 F.3d 1069, 1074-75 (9th Cir. 2009) (en banc) (stating

that the suspect was arrested inside his home when police surrounded his home during a twelve-hour standoff)[31], United States v. Reeves, 524 F.3d 1161, 1165 (10th Cir. 2008) (holding that a seizure occurs inside a home based solely on "the location of the arrested person, and not the arresting agents"), and United States v. Saari, 272 F.3d 804, 807-08 (6th Cir. 2001) (holding that Payton applies where police remain outside a suspect's home but "positioned themselves in front of the only exit from Defendant's apartment with their guns drawn[,] . . . knocked forcefully on the door and announced that they were the police" and "instructed [the defendant] to come outside").

These divergent views from the various Courts of Appeals have led at least the First Circuit to hold that the "constitutionality of doorway arrests" is unsettled and not clearly established. Joyce v. Town of Tewksbury, 112 F.3d 19, 22 (1st Cir. 1997) (en banc). There is no "robust consensus" placing the constitutionality of threshold arrests beyond debate such that an officer would have fair warning that conduct akin to Officer Rossetti's violates a plaintiff's constitutional rights. In Joyce, officers went to a house to arrest the homeowners' son for violating a domestic violence restraining order. Id. at 20. The officers knocked at the door and the son opened the interior door but kept the outer screen door closed. See id. After the officers told the son that they had a warrant for his arrest and asked him to step outside, the son said "ya right" and walked away from the door. Id. The police followed him inside, presumably opening the screen door to enter the house. See id. The First Circuit made the following observations:

---

[31] It appears that the Ninth Circuit Court of Appeals in Fisher assumed that officers could violate Payton if they surround a suspect's home and order him to leave his house in the absence of exigent circumstances and probable cause. See Fisher, 558 F.3d at 1075-76 (citing United States v. Al-Azzawy, 784 F.2d 890, 893 (9th Cir. 1986) (holding that the suspect was effectively arrested inside his home when police surrounded his trailer "with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees")).

[T]he present case is not entirely straightforward.  <u>Santana</u>'s exception likely does not turn on whether the individual is standing immediately outside or immediately inside the house when the police first confront him and attempt an arrest.  And, the fact that Massachusetts classifies the alleged violation here as a misdemeanor does not reduce it to a "minor offense," <u>see</u> <u>Welsh v. Wisconsin</u>, 466 U.S. 740, 753 (1984); we agree with the panel that "domestic violence and violations of protective orders are among the more grave offenses affecting our society."

On the other hand, we have no information as to whether [the defendant's] conduct that gave rise to the protective order involved actual violence, although the police may have had some basis for concern apart from the protective order. We have ourselves suggested that certain "mitigating factors" may undermine an exigency showing, including any inadequacy in the opportunity afforded for a peaceable surrender and the fact that entry occurs at nighttime. . . .  So, there are arguments to be made on both sides.

The Supreme Court cases, with <u>Steagald</u> at one pole and <u>Santana</u> at the other, do not definitively resolve our own case.  Even a quick review of lower court cases reveals that there is no settled answer as to the constitutionality of doorway arrests. . . .  Circuit court precedent is also divided, with some decisions helpful to the police in this case and others less so.

Given the unsettled state of the law, we have no hesitation in concluding that the officers in this case are protected by qualified immunity which protects public officials against section 1983 liability so long as they acted reasonably.

<u>Id.</u> at 21-22 (footnotes omitted).

Although <u>Joyce</u> was decided in 1997, even the Second Circuit in <u>Allen</u>, which was decided in 2016, acknowledged the divergent views among different Courts of Appeals on the issue of doorway arrests, further highlighting the unsettled state of the law.  For this reason, it was not clearly established to Officer Rossetti that he would have violated the Fourth Amendment when he decided to detain Mr. Beam who was standing at his open front door after Rossetti was told to step up his response time to a dropped 911 call reporting a domestic disturbance caused by the spouse at the door.  A reasonable officer would not have been on

notice that Officer Rossetti's conduct would have violated clearly established law.  Accordingly, summary judgment on the unlawful entry claim alleged in Count I will be granted.[32]

### 2.    Count I:  Excessive Force

#### a.    Constitutional Violation

Another claim in Count I alleges that Officers Wolf and Rossetti used excessive force in violation of the Fourth Amendment when they handcuffed him too tightly and did not loosen the handcuffs upon Mr. Beam's request.

In <u>Couden v. Duffy</u>, the Third Circuit described whether police conduct constitutes excessive force in violation of the Fourth Amendment:

> The use of excessive force is itself an unlawful "seizure" under the Fourth Amendment.  <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989); <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 240 (3d Cir. 2004).  In deciding whether challenged conduct constitutes excessive force, a court must determine the objective "reasonableness" of the challenged conduct, considering "'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  <u>Carswell</u>, 381 F.3d at 240 (quoting <u>Graham</u>, 490 U.S. at 396).  Other factors include "the duration of the [officer's] action[] [and] whether the action takes place in the context of effecting an arrest . . . ."  <u>Sharrar v. Felsing</u>, 128 F.3d 810, 822 (3d Cir. 1997).  In evaluating reasonableness, the court must take into consideration the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  <u>Graham</u>, 490 U.S. at 397.  Thus, the court should not apply "the 20/20 vision of hindsight," but should instead consider the "perspective of a reasonable officer on the scene."  <u>Id.</u> at 396.

446 F.3d 483, 496-97 (3d Cir. 2006).

---

[32] Officer Wolf also is named as a Defendant in Count I, which charges him with unlawful entry in violation of the Fourth Amendment.  He entered the home to assist Officer Rossetti in arresting Mr. Beam.  Since Rossetti is entitled to qualified immunity on the unlawful entry charges, Officer Wolf also is entitled to qualified immunity.  An officer has a right to enter a home to assist another officer who is making an arrest.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that an officer in Officer Rossetti's position was not justified in applying the amount of force used when attempting to handcuff Mr. Beam based on the lack of an immediate threat to Officers Wolf or Rossetti, both of whom had Mr. Beam on the ground face down when they handcuffed him.  At that point, Mr. Beam was not actively resisting arrest or attempting to evade arrest by flight.  Moreover, after Mr. Beam was handcuffed and while he was being taken to Officer Wolf's patrol car, Mr. Beam told Officers Wolf and Rossetti that the handcuffs were too tight and requested that they loosen the handcuffs.  According to Plaintiffs, they ignored his request.  After being driven in Officer Wolf's patrol car to the police station, Mr. Beam asked every officer he saw to loosen his handcuffs.  Mr. Beam testified that the officers laughed at him.  He remained handcuffed for the entire hour he was at the police station despite many requests that his handcuffs be loosened.[33]

Based upon the evidence submitted and viewing the facts in the light most favorable to Plaintiffs, the constitutional right at issue here is:  the right to be free from excessive force stemming from the use of handcuffs tightened to an unreasonable degree and not loosening those handcuffs upon the arrestee's request.

A jury crediting Plaintiffs' version of the facts could find that Officers Wolf and Rossetti tightened the handcuffs beyond the point necessary under the circumstances and they refused to loosen them upon Mr. Beam's request.  This conduct by the officers may constitute excessive force in violation of the Fourth Amendment.  Mr. Beam therefore has sufficiently alleged a

---

[33]  It does not appear that Officers Wolf and Rossetti are contesting whether the handcuffs were too tight, even though Rossetti testified at his deposition that he did not recall Mr. Beam indicating that the handcuffs were too tight and that he believes "Officer Wolf did loosen up his handcuffs . . . inside [Wolf's patrol car]."  (Doc. No. 54-10 at 31.)  Additionally, Officer Wolf testified at his deposition that he did not "recall [Mr. Beam] claiming he was injured" or having "any complaints of pain during the incident."  (Doc. No. 54-9 at 8-9.)

constitutional violation.  Next, the Court must turn to the second prong of the qualified immunity analysis and determine whether the constitutional right at issue here was clearly established on February 10, 2018.

### b.      Clearly Established

The second prong of the qualified immunity test is to determine whether the constitutional right to be free from excessive force by applying handcuffs too tightly was clearly established at the time of the alleged violation.  Although no Supreme Court case is on point, the Third Circuit has held that this right was clearly established in a case similar to this one.

In Kopec v. Tate, the plaintiff and his girlfriend trespassed onto a frozen lake on property belonging to an apartment complex.  361 F.3d at 774d.  The defendant, a police officer, responded to an anonymous call reporting plaintiff's trespass.  See id.  The defendant directed plaintiff and his girlfriend to get off the lake.  See id.  They complied.  See id.  Although the defendant was not going to charge them with trespassing, he requested that plaintiff and his girlfriend produce identifying information.  See id.  The plaintiff refused to provide this information and directed his girlfriend to do likewise.  See id.  The defendant became annoyed and "arrested him for disorderly conduct, and handcuffed him behind his back."  Id.

The Third Circuit next describes what occurred subsequent to the administration of handcuffs:

> Within ten seconds of being handcuffed, Kopec began to lose feeling in his right hand and, as a consequence, asked Officer Tate to loosen the handcuffs, but Officer Tate did not do so.  Kopec then asked if "this is what he does when people don't give him information."  Officer Tate did not answer. . . .
>
> Officer Tate took Kopec to his police car several feet away and left him alongside it as he went to interview [Kopec's girlfriend], who was close by.  As Officer Tate walked away, Kopec told him the pain was unbearable and begged him to loosen the handcuffs.  Again, Officer Tate did not comply with Kopec's request.  Kopec began to faint from the pain caused by the handcuffs and then fell to the ground.

42

> He asked Officer Tate to remove the handcuffs because he had lost feeling in his right hand.  Officer Tate said "I will be there in a minute," and did not go to Kopec immediately. . . .  Kopec asked him again either to loosen or remove the handcuffs while Kopec was groaning due to excruciating pain.  Officer Tate heard Kopec, but took no steps to assist him.  According to Kopec, it took Officer Tate about ten minutes from the time he had handcuffed Kopec finally to loosen the handcuffs.  Kopec claims to have permanent nerve damage in his right wrist as a result of the handcuffing, for which a hand surgeon treated him for over one year.

Id.

Although the Third Circuit in Kopec noted that "even though it appears that neither the Supreme Court nor this court has ruled that a police officer may be using constitutionally excessive force in tightening handcuffs[,]" the court held that

> the right of an arrestee to be free from the use of excessive force in the course of his handcuffing clearly was established [at least as early as 2000], and that a reasonable officer would have known that employing excessive force in the course of handcuffing would violate the Fourth Amendment.

Id. at 777-78; see also Rivera v. Lake Como, 733 F. App'x 587, 590 (3d Cir. 2018) ("As to the second part of the two-step inquiry, there is no dispute that the 'right of an arrestee to be free from the use of excessive force in the course of his handcuffing' is clearly established.") (quoting Kopec, 361 F.3d at 778).

After resolving factual disputes in Plaintiffs' favor, the similarities between this case and Kopec are quite noticeable.  Both cases involve handcuffing and alleged pain and discomfort within seconds.  Both involve requests to loosen the handcuffs.  Both involve refusals to immediately loosen handcuffs.  And both involved lasting nerve damage to the hand that required surgery.  As noted above, there need not be "precise factual correspondence," but rather sufficient similar facts that "provide an officer notice that a specific use of force is unlawful." Kisela, 138 S. Ct. at 1153.  In the Third Circuit, it is clearly established that officers may not use excessive force in handcuffing, especially where the arrestee puts the officer on notice that the

handcuffs are too tight and the officer either delays unreasonably the loosening of them or ignores the request altogether.  Thus, because Officers Wolf and Rossetti were on notice that their conduct violated clearly established law, they are not entitled to qualified immunity on Plaintiffs' excessive force claim alleged in Count I.

### 3.   Counts I and IX:  False Arrest and False Imprisonment

In Count I, Plaintiffs assert that Mr. Beam was falsely arrested and falsely imprisoned in violation of the Fourth Amendment and brings these claims under Section 1983.  Further, in Count IX, Plaintiffs allege another false imprisonment claim.  It is unclear whether Plaintiffs are asserting in Count IX the same false imprisonment claim in violation of the Fourth Amendment that he is alleging in Count I or a state-based claim for false imprisonment.  Giving Plaintiffs the benefit of the doubt, this cause of action will be construed as falling under both claims.  But because Plaintiffs' false arrest and false imprisonment claims both hinge in this case on the effect of Mr. Beam's guilty plea to disorderly conduct, both claims will be addressed together.

In this regard, Heck v. Humphrey, 512 U.S. 477 (1994) is applicable precedent.  "The Heck Doctrine precludes a plaintiff from pursuing a civil claim under 42 U.S.C. § 1983 that would directly contradict a previous holding in criminal court."  Davis v. Egg Harbor Twp., Civil No. 14-4213, 2017 WL 2423053, at *5 (D.N.J. June 5, 2017) (citing Heck, 512 U.S. at 477).  In Heck, the Supreme Court held that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments."  512 U.S. at 486.  In other words, if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction . . . [the] complaint will be dismissed."  Id. at 487.  Each of Plaintiffs' two state tort-based Section 1983 claims will be addressed in turn.

To state a claim for false arrest, Mr. Beam must prove that the officers lacked probable cause to arrest him.  See Andrews v. Scuilli, 853 F.3d 690, 697 (3d Cir. 2017) (citation omitted). And to succeed on his false imprisonment claim, Mr. Beam must show that (1) he was detained and (2) the detention was unlawful.  See Geissler v. Atl. City, 198 F. Supp. 3d 389, 397 (D.N.J. 2016).  "[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest."  Harvard v. Cesnalis, 973 F.3d 190, 202 (3d Cir. 2020) (quoting Groman v. Twp. of Manalapan, 47 F.3d 628, 636 (3d Cir. 1995)).  "False arrest and false imprisonment claims will 'necessarily fail if probable cause existed for any of the crimes charged against the arrestee.'"  Harvard, 973 F.3d at 199 (quoting Dempsey v. Bucknell Univ., 834 F.3d 457, 477 (3d Cir. 2016)).

However, "a guilty plea—even one for a lesser offense—does not permit a later assertion of no probable cause."  Walker v. Clearfield Cnty. Dist. Atty., 413 F. App'x 481, 484 (3d Cir. 2011).  Thus, where a plaintiff pled guilty to one of the offenses underlying his arrest, he or she is precluded from arguing that the arrest was effectuated without probable cause.  Cf. McGann v. Collingswood Police Dept., Civil No. 10-3458, 2012 WL 6568397, at *10 (D.N.J. Dec. 17, 2012) (granting summary judgment for defendants where plaintiff's "guilty plea . . . directly contradicts Plaintiff's assertion that no probable cause existed for his alleged arrest . . . [and] because Plaintiff cannot demonstrate the absence of probable cause, an essential element for his false arrest claim   . . . .").

Here, both parties agree that although the resisting arrest and obstruction of justice charges against Mr. Beam were dropped, he pled guilty to disorderly conduct in connection with

his actions on February 10, 2018 and is still paying a $1,000 fine.[34]  (See Doc. No. 54-8 at 122-23.)  Accordingly, given his guilty plea, his assertion that Defendants lacked probable cause to arrest him or that his detention was unlawful is unpersuasive.  This assertion would directly contradict his guilty plea to disorderly conduct and violate the Heck doctrine.  Therefore, because Plaintiffs have failed to establish that a constitutional right was violated, there is no need to address the "clearly established" prong of qualified immunity.  Also, even if the false imprisonment claim brought under state law is construed as a cause of action under § 1983, it would lead to the same result because probable cause to detain him was established by his guilty plea.  Defendants are entitled to dismissal of Counts I and IX not only because they are entitled qualified immunity on the § 1983 claims for false arrest and false imprisonment, respectively, but also because the probable cause to arrest based on the disorderly conduct charge would preclude the state law claim of false imprisonment.  Summary judgment on those claims, therefore, will be entered in their favor.

### 4.  Count I:  Fourteenth Amendment Due Process Violations

Although not listed as a separate count, the Court discerns vague assertions from the Complaint that "Defendants' conduct also deprived plaintiffs of [their] right to due process of law, pursuant to the Fourteenth Amendment to the United States Constitution."  (Doc. No. 1 at 7.)  It is not clear whether Plaintiffs are asserting that Defendants violated their substantive or

---

[34]  It is unclear whether Mr. Beam pled guilty to disorderly conduct for his conduct before Officer Rossetti attempted to handcuff him, during Officers Wolf and Rossetti's attempt to handcuff him, or while he was being escorted to the back of Wolf's patrol car.

their procedural due process rights under the Due Process Clause.[35]   Both will be addressed below.

The Due Process Clause of the Fourteenth Amendment provides:  "nor shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Fourteenth Amendment's Due Process Clause protects both substantive and procedural due process rights.  See United States v. Salerno, 481 U.S. 739, 746 (1987).  The relevant inquiry in determining whether government conduct violates substantive due process "is whether the behavior of the government officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 425 (3d Cir. 2006) (internal quotation marks omitted) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  In Kaucher, the Third Circuit explained when certain governmental conduct constitutes conscience-shocking conduct:

> ". . . [T]he measure of what is conscience shocking is no calibrated yard stick," Lewis, 523 U.S. at 847, and "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another," id. at 850.  The question of whether a given action "shocks the conscience" has an "elusive" quality to it.  Estate of Smith v. Marasco (Smith I), 318 F.3d 497, 509 (3d Cir. 2003).  At one end of the spectrum of culpable conduct, negligent behavior can never rise to the level of conscience shocking.  See Lewis, 523 U.S. at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").  At the other end of the spectrum, actions "intended to injure in some way unjustifiable by any government interest" are those "most likely to rise to the conscience-shocking level."  Id.  Acts that fall

---

[35] Although not included in the Complaint, Plaintiffs assert in their Response in Opposition to the summary judgment motion that they are seeking relief for violations "of the rights afforded to them by . . . the Fourth, Fifth and Fourteenth Amendments to the United States Constitution . . . ."  (Doc. No. 56 at 13 (emphasis added).)  To the extent Plaintiffs allege violations of the Due Process Clause of the Fifth Amendment, summary judgment will be entered in Defendants' favor since "the Fifth Amendment 'does not directly apply to actions of state officials,' and '[t]he limitations of the Fifth Amendment restricts only federal government action.'"  Brandywine Vill. Assocs. v. East Brandywine Twp., No. 20-2225, 2020 WL 5517353, at *6 (E.D. Pa. Sept. 14, 2020) (citing Nicolette v. Caruso, 315 F. Supp. 2d 710, 718 (W.D. Pa. 2003) (citations omitted)).

between the extremes of mere negligence and harmful intent require courts to make "close calls," based on a context-specific inquiry.  Id.

Because the "exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case," Miller v. City of Philadelphia, 174 F.3d 368, 375 (3d Cir. 1999), we evaluate the conditions under which a defendant acted in order to ascertain the relevant standard of culpability.  See Smith I, 318 F.3d at 508 . . . .  Where a defendant is "confronted with a hyperpressurized environment such as a high-speed chase . . . it is usually necessary to show that the officer deliberately harmed the victim." Estate of Smith v. Marasco (Smith II), 430 F.3d 140, 153 (3d Cir. 2005) (quotations and citations omitted).  Where a defendant has "the luxury of proceeding in a deliberate fashion . . . deliberate indifference may be sufficient to shock the conscience."  Id. (quotations and citations omitted) . . . .  Where a defendant has to act with some urgency, but does not have to make split-second decisions—such as when a social worker attempts to remove a child from the parents' custody—the defendant's actions must "reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Miller, 174 F.3d at 375-76 . . . .

455 F.3d at 425-27.

Here, it cannot be said that Officers Wolf and Rossetti's conduct toward Mr. Beam was so egregious or outrageous that it shocks the conscience under any of the above three standards. The officers responded to a 911 call of a domestic emergency and factors arose on the scene to justify their entry into the home and arrest of Mr. Beam.  And although the Complaint alleges that Mr. and Mrs. Beam told the officers that no domestic disturbance occurred and that the officers' presence no longer was needed, Plaintiffs were aware that Officers Wolf and Rossetti still had to respond and ensure that everyone at the residence was safe and accounted for. Moreover, Mr. Beam pled guilty to a disorderly persons charge stemming from his conduct on February 10, 2018.

Additionally, none of the other alleged instances of harassment by Defendants constitutes egregious or outrageous conduct that shocks the conscience.  Plaintiff's allegation that Pemberton police officers were involved in the October 11, 2017 towing of his motorcycle which was parked on his neighbor's front lawn are not supported by evidence.  Rather, Mr. Beam at his

deposition speculated that the Pemberton PD had his motorcycle in its possession after the towing company took it because "[w]hy else would [the tow company] be telling me they didn't have [the motorcycle] unless they had contract with the police to tell them so."  (Doc. No. 54-8 at 138.)

Mr. Beam's contention that his January 18, 2018 interaction with Officer Rossetti was conscience-shocking likewise is unsupported by the evidence.  To repeat, that incident involved Mr. Beam calling 911 to report that an unknown man fired a gun at him and Officer Rossetti was dispatched to investigate the area.  However, Officer Rossetti testified that when he arrived to the location where Mr. Beam reported the gun shot, he made contact with him and attempted to ask him questions to find out more information about the incident.  (Doc. No. 54-10 at 36.)  Mr. Beam asserts, on the other hand, that "instead of giving [him] a hand and going after the people that shot at [him], [he] was assaulted by Officer Rossetti once again on camera.  He tried to detain me for no reason."  (Doc. No. 54-8 at 144.)  Regarding Mr. Beam's November 1, 2018 interaction with Officer Laffan, where Mr. Beam alleges that Laffan "unlawfully stopped, detained and arrested" him, the Complaint alleges that "[a]n officer from Pemberton later telephoned Dawn Beam saying that Richard was arrested by mistake and 'we thought it was somebody else.'"  (Doc. No. 1 at 5-6.)  In fact, after Officer Laffan released Mr. Beam, Officer Laffan offered to drive Mr. Beam to court for a hearing he had to attend.[36]  This conduct does not shock the conscience.

Turning to procedural due process, a plaintiff "must allege that she was deprived of an individual interest that is 'encompassed within the Fourteenth Amendment's protection of life, liberty, or property' and that the available procedures did not provide due process of law."

---

[36]  Plaintiffs never deposed Officer Laffan about this alleged arrest of Mr. Beam or to learn more about what information Laffan had at the time.

Thompson v. Del. Dep't of Servs. for Child., Youth & their Fams., 44 F.4th 188, 194 (3d Cir. 2022) (quoting In re Energy Holdings Corp., 949 F.3d 806, 822 (3d Cir. 2020) (citation omitted)).  Plaintiffs do not assert the procedures they were deprived of and nothing in the record suggests that the process Mr. Beam received was any less than that "due" under the Fourteenth Amendment.

Because Plaintiffs have not established a procedural or substantive due process violation, the officers are entitled to qualified immunity on these claims.  Consequently, summary judgment will be entered in Defendants' favor on Plaintiffs' Fourteenth Amendment Due Process Clause claims alleged in Count I.

**D.      Plaintiffs' State Law Claims**

**1.      Summary Judgment on Plaintiffs' State Law Claims Alleged in Counts VII to XI Will Be Granted in Favor of Defendants Township of Pemberton and Township of Pemberton Police Department**

Plaintiffs allege state causes of action against Defendants Township of Pemberton (the "Township") and Pemberton Township Police Department (the "Pemberton PD") in Counts VII to XI, all of which are intentional torts.[37]  Defendants claim that the Township and the Pemberton PD are immune from these claims under the New Jersey Tort Claims Act and, for this reason, Plaintiffs' claims against them fail as a matter of law.  As discussed below, summary judgment will be entered in the Township and Pemberton PD's favor on Counts VII to XI.

The New Jersey Tort Claims Act (the "NJTCA") provides that "[a] public entity is not liable for acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct."  N.J.S.A. § 59:2-10.  The NJTCA has been interpreted to immunize

---

[37] They are:  (1) intentional infliction of emotional distress (Count VII); (2) battery (Count VIII); (3) false imprisonment (Count IX); (4) abuse of process (Count X); and (5) malicious trespass (Count XI).  (Doc. No. 1 at 11-13.)

public entities from intentional torts committed by its employees.  See, e.g., McGovern v. City of Jersey City, 98-5186, 2006 WL 42236, at *15 (D.N.J. Jan. 6, 2006) (dismissing intentional infliction of emotional distress and assault and battery claims against municipality under New Jersey Tort Claims Act); Bonitsis v. N.J. Inst. of Tech., 833 A.2d 679, 685 (N.J. Super. Ct. App. Div. 2003) ("Under the [New Jersey Tort Claims] Act, a public entity is not liable for intentional torts.").

Intentional infliction of emotional distress, battery, false imprisonment,[38] abuse of process, and malicious trespass are intentional torts.  Accordingly, the Township of Pemberton and the Pemberton Police Department as public entities covered by the NJTCA are entitled to immunity from Plaintiffs' state law claims as a matter of law.  Summary judgment therefore will be entered in their favor on Counts VII to XI.

> **2.     Summary Judgment on Plaintiffs' Negligent Hiring and Retention Claim Alleged in Count V Will Be Granted in Favor of Defendants Township of Pemberton and Township of Pemberton Police Department**

In Count V, Plaintiffs allege a negligent hiring and retention claim against Defendants Township of Pemberton and its police department.  The Complaint states that "the Chief of Police and defendant officers were incompetent and unfit for their positions" and that the Township "knew or should have known through exercise of reasonable diligence that the officer defendants were potentially dangerous and had previously falsely arrested and caused physical injuries to civilians without probable or just cause."  (Doc. No. 1 at 11.)  Defendants argue to the contrary that Count V lacks evidentiary support to defeat summary judgment because it does not

---

[38] Plaintiffs' false imprisonment claim also was considered, supra, in Section IV.C.3. of this Opinion.  Plaintiffs have failed to establish this claim.

identify the Township's screening procedures and they assert that Officers Wolf and Rossetti were fit for duty.  (See Doc. No. 59 at 17-18.)

> Under New Jersey law:
>
> the tort of negligent hiring has as its constituent elements two fundamental requirements.  The first involves the knowledge of the employer and foreseeability of the harm to third persons.  An employer will only be held responsible for the torts of its employees beyond the scope of employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons.  The second required showing is that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury.

Adams v. City of Camden, 461 F. Supp. 2d 263, 269 (D.N.J. 2006) (quoting Di Cosala v. Kay, 450 A.2d 508, 516 (N.J. 1982) (citations omitted)).  In Adams, the court granted summary judgment for the defendants where the plaintiff had not "informed the Court of the City' screening practices" and "[n]othing in the record before the Court indicates any unfitness of [the defendant police officer] or any other John Doe officer involved in this incident . . . ."  Id. at 260, 270.

Here, like the plaintiff in Adams, Plaintiffs have not provided any evidence regarding the Township's hiring practices, Officer Wolf's or Officer Rossetti's unfitness as police officers, or any evidence regarding the Chief of Police's unfitness for duty—which itself is unaccompanied by any supportive evidence in the record.  Therefore, summary judgment will be entered in favor of Defendants Township of Pemberton and Pemberton Police Department on the negligent supervision claim alleged in Count V.

### 3.    Summary Judgment on Plaintiffs' State Law Claims Will Be Granted in Part and Denied in Part as to Officers Wolf and Rossetti

Plaintiffs also alleges state law claims of civil conspiracy (Count III), intentional infliction of emotional distress (Count VII), battery (Count VIII), false imprisonment (Count IX), abuse of process (Count X), and malicious trespass (Count XI) against Officers Wolf and Rossetti. Summary judgment will be granted on Counts VII and Count IX to XI, and will be denied on Counts III and VIII. Each claim will be addressed in turn.[39]

### a.    Civil Conspiracy (Count III)

In Count III, Plaintiffs claim that "Defendants agreed to violate the plaintiffs' rights [as described in the Complaint]. Further defendants made an agreement to attempt to cover up the false arrest, wrongful treatment and unlawful incarceration of Plaintiff." (Doc. No. 1 at 10.) They aver that Defendants conspired to handcuff Mr. Beam in retaliation "for filing the Notice of Tort Claims and [] attempting to bring charges against him for another unrelated matter(s)." (Id.)

---

[39] Defendants argue that Plaintiff has not made met what is known as the "verbal threshold" requirement of the New Jersey Tort Claims Act ("NJTCA") and, therefore, Defendants are entitled to summary judgment on those claims. Their argument is without merit, at least at the summary judgment stage. The verbal threshold requirement of the NJTCA provides that:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.

N.J.S.A. § 59:9-2(d). However, "that limitation does not apply to willful or other outrageous misconduct excepted under N.J.S.A. § 59:3-14." Nieves v. Adolf, 230 A.3d 227, 235 (N.J. 2020) (citing Leang v. Jersey City Bd. of Educ., 969 A.2d 1097, 1113 (N.J. 2009)). Under New Jersey law, whether a public employee engaged in willful misconduct is a question of fact. See Toto v. Ensaur, 952 A.2d 463, 471 (N.J. 2008) ("Thus, if the jury finds that the public employee in a false arrest/false imprisonment claim committed willful misconduct, the plaintiff is entitled to recover damages without regard to the limitations of the verbal threshold.").

Under New Jersey law:

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" . . . The gist of the claim is not the unlawful agreement, "but the underlying wrong which, absent the conspiracy, would give a right of action." . . .

To establish a conspiracy, "it simply must be shown that there was 'a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'"

Morgan v. Union Cnty. Bd. of Chosen Freeholders, 633 A.2d 985, 998-99 (N.J. Super. Ct. App. Div. 1993) (citations omitted). As the court in Morgan continued, a party need not "provide direct evidence of the agreement between the conspirators." Id. at 998. This is because "[a]bsent the testimony of a co-conspirator, it is unlikely that direct evidence of an unlawful agreement will exist." Id. (citation omitted). Rather, "[i]t is 'well known that the nature of a conspiracy is such that more often than not the only type of evidence available' is circumstantial in nature." Id. at (quoting Bd. of Educ. v. Hoek, 183 A.2 633, 646-47 (N.J. 1962)). "[S]o long as there is a possibility that the jury can 'infer from the circumstances [that the alleged conspirators] had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives," then a genuine dispute of fact exists. Id. (citation omitted).

New Jersey courts have recognized civil conspiracy claims under state law where the parties conspire to violate federal constitutional or statutory rights. In Morgan, quoted supra, the New Jersey Superior Court held that the trial court erred in withholding the plaintiff's civil conspiracy claim where there was sufficient evidence for a jury to find that the defendants conspired to deprive the plaintiff of his rights under the First Amendment to the United States Constitution. 633 A.2d at 998. And in Mastrofilippo v. Borough of Little Ferry, the New Jersey Superior Court held in an unpublished opinion that the lower court erred when it did not permit

54

the plaintiffs to amend their complaint to add a state civil conspiracy claim where they alleged that the defendants conspired to "depriv[e] him 'of his constitutional rights to be free from false arrest, malicious prosecution, and abuse of process.'"  2017 WL 2991774, at *4 (N.J. Super. Ct. App. Div. July 14, 2017).  Thus, Plaintiffs' state law civil conspiracy claim can rest on allegations that Defendants agreed to violate Mr. Beam's federal constitutional rights.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable factfinder could find in Plaintiffs' favor that Officers Wolf and Rossetti, and indeed potentially some of the officers at the police station, engaged in a conspiracy by agreeing to not loosen Mr. Beam's handcuffs.  Plaintiffs allege that almost immediately after being handcuffed, Mr. Beam told both Officers Wolf and Rossetti that the handcuffs were too tight and requested that they loosen them. They ignored his request.  Then, while Mr. Beam was at the police station, he allegedly asked every officer he encountered to loosen his handcuffs.  Plaintiffs therefore have properly alleged sufficient facts that would allow a reasonable jury to find that Defendants agreed to ignore Mr. Beam's requests to loosen his handcuffs and thus violated his right under the Fourth Amendment not to be subject to excessive force during an arrest. [40]  Accordingly, Defendant's Motion for Summary Judgment will be denied on Count III.

---

[40] It is unclear on the face of the Complaint whether Plaintiff is alleging a civil conspiracy under state or federal law, but in their Motion for Summary Judgment, Defendants cite New Jersey law to assert that Plaintiffs' civil conspiracy claim should be dismissed.  In their Response to the Motion, Plaintiffs do not specifically address whether they are asserting their civil conspiracy claim under state or federal law.  However, to the extent the civil conspiracy claim alleged in Count III is raised under Section 1983 rather than under state law, it also will survive summary judgment.

"To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 293-94 (3d Cir. 2018) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 150-52 (1970)).  In the absence of direct proof of a conspiracy, a "'meeting of the minds' or 'understanding or agreement to conspire' can be

**b.      Intentional Infliction of Emotional Distress (Count VII)**

In Count VII of the Complaint, Plaintiffs allege that "[a]ll Defendants engaged in, instigated, and directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard of the Plaintiff.  . . .  As a proximate result of the acts alleged herein Plaintiffs suffered severe or extreme emotional distress . . . ."  (Doc. No. 1 at 11-12.) Defendants, on the other hand, claim that the record is devoid of facts supporting Plaintiffs' claim.  (See Doc. No. 54-2 at 30.)

Under New Jersey Law, to state a claim for intentional infliction of emotional distress, a plaintiff must show:

> (1) that the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was "extreme and outrageous," (3) that the actions of the defendant were the cause of the plaintiff's distress, and (4) "that the emotional distress sustained by the plaintiff was severe."

Sebastian v. Vorhees Twp., Civil No. 08-6097, 2011 WL 540301, at *7 (D.N.J. Feb. 8, 2011) (quoting Cole v. Laughrey Funeral Home, 869 A.2d 457, 464 (N.J. Super. Ct. App. Div. 2005)).

---

'infer[red]' from circumstantial evidence."  Id. at 294 (quoting Startzell v. City of Phila., 533 F.3d 183, 205 (3d Cir. 2008)).  The court in Jutrowski continued:

> Because "inferring mental state from circumstantial evidence is among the chief tasks of factfinders, Kedra v. Schroeter, 876 F.3d 424, 444 (3d Cir. 2017) (citing United States v. Wright, 665 F.3d 560, 569 (3d Cir. 2012)), an allegation of conspiracy can only be overcome at summary judgment when "the moving parties' submissions foreclose[] the possibility of the existence of certain facts from which 'it would be open to a jury . . . to infer from the circumstances' that there had been a meeting of the minds," Anderson[ v. Liberty Lobby, Inc.], 477 U.S. [242,] 249 [(1986)] (citing Adickes, 398 U.S. [at 158-59]).

As discussed supra, there is sufficient evidence for a reasonable jury to conclude that Officers Wolf and Rossetti agreed to unreasonably tighten Mr. Beam's handcuffs and to ignore his requests to loosen them.  Defendants' filings do not foreclose the possibility that a jury could infer a meeting of the minds based on their alleged refusal to loosen his handcuffs. Accordingly, even if Plaintiffs' civil conspiracy claim is asserted under Section 1983, Count III will survive summary judgment.

56

To establish the fourth element—severe emotional distress—"a plaintiff must show a 'severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.'"  Griffin v. Tops Appliance City, Inc., 766 A.2d 292, 298 (N.J. Super. Ct. App. Div. 2001) (quoting Taylor v. Metzger, 706 A.2d 685, 697 (N.J. 1998)).

Here, Plaintiffs' allegations of intentional infliction of emotional distress lack evidentiary support.  Even given the extensive record underlying this case, there are no material facts showing that Plaintiffs suffered severe emotional distress, aside from their conclusory statements themselves.  During Mr. Beam's deposition, the only injury he said his wife suffered as a result of the February 10, 2018 incident was "[s]tress."  (Doc. No. 54-8 at 70.)  Mrs. Beam attributed her stress to "hav[ing] to deal with [Mr. Beam], the aggravation.  It caused arguments between us. . . . We had arguments before, but it just got worse."  (Doc. No. 54-7 at 35.)  Furthermore, Mr. Beam agreed that Mrs. Beam "never sought any healthcare treatment, mental health or otherwise, for anything related to this incident."  (Doc. No. 54-8 at 70-71.)

Plaintiffs did not testify at their depositions to any other type of emotional distress they suffered from the incident or produce any medical records establishing that they sought treatment for any emotional distress.  See Johnson v. City of Camden Police Dep't, No. 96-5840, 1998 WL 975433, at *13 (D.N.J. Dec. 31, 1998) (denying summary judgment where there was "no evidence that [the plaintiff] ever sought professional medical attention for his alleged emotional distress"); see also Buckley v. Trenton Saving Fund Soc'y, 544 A.2d 857, 864 (N.J. 1988) (finding evidence of lost sleep, aggravation, embarrassment, headaches, and nervousness "insufficient as a matter of law to support a finding that the mental distress was so severe that no reasonable man could be expected to endure it").

Thus, there is no genuine dispute over whether Plaintiffs suffered severe emotional distress and Plaintiffs do not adduce any evidence that they suffered such distress. Accordingly, as a matter of law, no reasonable factfinder could find that Plaintiffs suffered emotional distress severe enough to support Count VII. Therefore, summary judgment on Count VII will be granted.

### c.     Battery (Count VIII)

Count VIII of the Complaint alleges that Defendants are liable for battery because they "caused Plaintiff, Richard Beam, to be touched without his consent and with the intent to harm him"; "Plaintiff did not consent to the touching." (Doc. No. 1 at 12.) Defendants assert that they were entitled to use reasonable force to arrest Mr. Beam since he was resisting arrest. (See Doc. No. 54-2 at 30-31.) However, because Plaintiffs' excessive force claim for the tightened handcuffs alleged in Count I survives summary judgment, their battery claim also survives summary judgment.

Under New Jersey law, "[a] person may be liable for battery if 'he acts intending to cause a harmful or offensive contact . . . or an imminent apprehension of such contact' and a 'harmful' or 'offensive' contact 'directly or indirectly results.'" Abraham v. Raso, 15 F. Supp. 2d 433, 448 (D.N.J. 1998) (quoting Giovine v. Giovine, 663 A.2d 109, 125 (N.J. Super. Ct. App. Div. 1995) (citation omitted)). However, a privilege to commit battery exists for police officers:

> "Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." Groman, 47 F.3d 634 (citing Edwards v. City of Phila., 860 F.2d 568, 572 (3d Cir. 1998)) . . . . The officer may "use only such force as may be reasonably necessary to effectuate the arrest." State v. Lore, 197 N.J. Super. 277, 282, 484 A.2d 1259, 1262 (App. Div. 1984) . . . . Where a person resists arrest the officer not only is justified in employing reasonable force, but has a duty to employ such force in order to overcome resistance and make the arrest. . . . Generally, "where . . . an offender offers physical resistance to arrest . . ., the officer need not retreat, but on the contrary may become the aggressor and use such force as is necessary to

58

> overcome the resistance. . . ." <u>State v. Williams</u>, 29 N.J. 27, 39, 148 A.2d 22, 28 (1959).  The inquiry is an objective one:  was the force used reasonably necessary in view of the totality of the circumstances as they appeared to the officer. <u>Williams</u>, 29 N.J. at 38, 148 A.2d at 29.

<u>Abraham</u>, 15 F. Supp. 2d at 448-49.  As noted <u>supra</u> in Section IV.C.2. of this Opinion, in discussing the denial of summary judgment on Plaintiffs' excessive force claims regarding the officers' unreasonable tightening of Mr. Beam's handcuffs, there exists a triable issue of fact that could lead a reasonable jury to find that the officers used excessive force and, thus, lost any privilege to commit a battery by tightening the handcuffs beyond the point necessary to restrain Mr. Beam.  Accordingly, Defendants' Motion for Summary Judgment will be denied as to Count VIII.

### d.      False Imprisonment (Count IX)

Regarding Plaintiffs' false imprisonment claim in Count IX, "[t]he gist of an action for false imprisonment is unlawful detention, without more." <u>Cannon v. Krakowitch</u>, 148 A.2d 213, 215 (N.J. Super. Ct. App. Div. 1959) (citing <u>Earl v. Winne</u>, 101 A.2d 535, 539 (N.J. 1953); <u>Lakutis v. Greenwood</u>, 87 A.2d 23, 25 (N.J. 1952)).  Aside from these older cases, New Jersey courts have not provided much guidance on the scope of false imprisonment.

However, New Jersey courts have held that "[l]egal justification or probable cause for detention are the defenses to an action for false arrest or imprisonment." <u>Hayes v. Mercer</u>, 526 A.2d 737, 741 (N.J. Super. Ct. App. Div. 1987) (citing <u>Jorgenson v. Pa. R.R. Co.</u>, 118 A.2d 854, 872 (N.J. Super. Ct. App. Div. 1955)); <u>see</u> <u>also</u> <u>Prinz v. Greate Bay Casino Corp.</u>, 705 F.2d 692, 694 (3d Cir. 1983) (stating that New Jersey law recognizes probable cause to arrest as "a defense to a charge of false imprisonment") (citing <u>Jorgenson</u>, 118 A.2d at 872).  As noted <u>supra</u>, Plaintiffs' claim for false imprisonment was foreclosed by Mr. Beam's entry of a guilty plea to disorderly conduct stemming from his behavior during the February 10, 2018 incident.

> Additionally, under New Jersey law:

> Whenever an offense is committed in his presence, any constable or police officer shall, and any other person may, apprehend without warrant or process any disorderly person, and take him before any magistrate of the county were apprehended.

N.J.S.A. § 2A:169-3.  That section pertains to warrantless arrests of disorderly persons.  The parties do not dispute that Mr. Beam pled guilty to a disorderly conduct charge in connection with his behavior, which was personally observed by Officers Wolf and Rossetti, during the February 10, 2018 incident.  By pleading guilty to disorderly conduct, Mr. Beam is precluded from asserting a false imprisonment claim.  Accordingly, summary judgment will be granted on Count IX in Defendants' favor.

### e.    Abuse of Process (Count X)

In Count X, Plaintiff alleges an abuse of process claim by claiming that "Defendants willfully and wrongfully entered Plaintiff's marital home and confined and injured Plaintiff, and arrested and detained him to retaliate against Plaintiff for his activities and otherwise to harass and harm him."  (Doc. No. 1 at 13.)

"A successful claim of malicious abuse of process . . . requires a defendant's improper, unwarranted and perverted use of process after it has been issued." Stolinski v. Pennypacker, 772 F. Supp. 2d 626, 644-45 (D.N.J. 2011) (quoting Wozniak v. Pennella, 862 A.2d 539, 549 (N.J. Super. Ct. App. Div. 2004) (internal quotation marks omitted)).  "The 'process' that must have been abused 'includes the summons, mandate, or writ used by a court to compel the appearance of the defendant in a legal action or compliance with its order.'"  Id. (quoting Wozniak, 862 A.2d at 549) (citation omitted).  For an abuse of process claim, "process" is a narrow term that "refers to the abuse of procedural methods used by a court to 'acquire or

exercise its jurisdiction over a person or over specific property.'"[41]   Ruberton v. Gabage, 654 A.2d 1002, 1005 (N.J. Super. Ct. App. Div. 1995).   New Jersey courts have clarified that "process is not abused unless after its issuance the defendant reveals an ulterior purpose he had in securing it by committing 'further acts' whereby he demonstrably uses the process as a means to coerce or oppress the plaintiff."   Hoffman v. Asseenontv.com, Inc., 962 A.2d 532, 541 (N.J. Super. Ct. App. Div. 2009) (citing Ruberton, 654 A.2d at 1005) (citations omitted).

Here, notwithstanding Plaintiffs' conclusory allegations that Defendants arrested him to retaliate against him "for his activities and otherwise to harass and harm him," Plaintiff fails to demonstrate any genuine issue of material fact as to the abuse of process claim.   (Doc. No. 1 at 13.)   Plaintiffs have not supplied any evidence to show that Defendants attempted to or did leverage any court to issue an order so that they may further use that "order as a means to coerce" Plaintiffs.   Ruberton, 654 A.2d at 1006.   Moreover, there is no genuine dispute of material fact because, viewing the evidence in the light most favorable to Plaintiffs as the non-movants, there is no indication that Defendants used any process to harass, coerce, or oppress Plaintiffs.   Although Plaintiffs allege that Defendants "had a custom and pattern of systematic discriminatory actions against Mr. Beam of several years breaching their duty of care to the Beams," there is no evidence that any Defendant had utilized process, such as issuing summonses or having a court issue writs or orders, in a coercive or illegitimate manner. Plaintiffs do not identify a case in which process was abused, thus obviating the possibility of allowing a jury to find that there has been an abuse of process.   Accordingly, summary judgment on Count X will be entered in Defendants' favor.

---

[41]   In Ruberton, the court distinguished this narrow scope of "process" from its more "general use, as being 'the whole course of proceedings in a legal action.'"   Id. at 1005-06 (citation omitted).

61

f.        **Malicious Trespass (Count XI)**

As to Count XI, Plaintiffs contend that Defendants trespassed on their property "without legal authorization" and with "malicious intent." (Doc. No. 1 at 13.) An action for malicious trespass is similar to a typical action for trespass, except that the plaintiff needs to show: "(1) actual malice, which is nothing more or less than intentional wrongdoing—an evil-minded act; or (2) an act accompanied by a wanton and willful disregard of the rights of another." Berg v. Reaction Motors Div., Thiokol Chem. Corp., 181 A.2d 487, 496 (N.J. 1962) (internal quotation marks omitted) (quoting La Bruno v. Lawrence, 166 A.2d 822, 824 (N.J. Super. Ct. App. Div. 1960)). However, "when a law enforcement officer walks to a front or back door for the purpose of making contact with a resident and reasonably believes that the door is used by visitors, he is not unconstitutionally trespassing on to the property." State v. Domicz, 907 A.2d 395, 405 (N.J. 2006) (citation omitted).

Here, it is undisputed that police officers were required to respond to a disconnected 911 call that occurred when Plaintiffs' youngest daughter called 911 and their son hung up the phone. (See Doc. No. 54-8 at 92-93.) Officers Wolf and Rossetti had a duty to respond to the 911 call and to enter Plaintiffs' property to ascertain whether any ongoing risk of danger existed or whether further investigation was warranted to assuage any concerns of recent domestic violence. Wolf and Rossetti, therefore, did not commit a trespass onto Plaintiffs' property when they entered for the purpose of "making contact with" Plaintiffs on their front lawn and at their front door to investigate the 911 report of a domestic disturbance. Domicz, 907 A.2d at 405. Therefore, because Officers Wolf and Rossetti are not liable for trespass, they also cannot, as a matter of law, be found liable for malicious trespass. Accordingly, the Motion for Summary Judgment will be granted on Count XI.

**E.     Pemberton Police Department's Chief of Police, Officer Laffan, and John Does 1-10 Will Be Dismissed as Defendants**

Plaintiffs name the Pemberton Police Department's Chief of Police, Officer Laffan, and John Does 1-10 as Defendants.  Defendants contend that summary judgment on all counts should be entered in its favor since the Complaint does not allege any way in which the Chief of Police, Officer Laffan, and the ten unnamed police officers were involved in any of the claims alleged in the eleven Counts.

It is axiomatic that "personal involvement of each defendant is a prerequisite to liability in § 1983 cases." Jutrowksi, 904 F.3d at 291.  In Justrowski, the Third Circuit held that "in the face of motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." Id. at 291-92.  In other words, a § 1983 plaintiff who does not identify which actors undertook which allegedly unconstitutional action at the summary judgment stage essentially "seeks to proceed to trial against . . . defendants who are 'free of liability' . . . without any 'ascertainment of [which] individual charged was the perpetrator of the constitutional deprivation' . . . ." Id. at 292.  Jutrowski held that this scenario "is not a sufficient basis to survive summary judgment." Id.

As to the Chief of Police, Plaintiff does not allege he is personally involved in any of the conduct alleged in the Complaint.  In fact, the only reference to the Chief of Police appears to be in Hentz's expert report.  The report avers without factual support that the Chief ignored Mr. Beam's complaints against the Pemberton PD.  (See Doc. No. 56 at 33.)  Since the Counts to which this evidence is relevant are being dismissed (Counts I and II), the Chief of Police must be dismissed as a Defendant in this case.  As to Defendant Laffan, aside from an incident where Mr. Beam allegedly was mistaken as a potential suspect in a 911 call reporting a gun shot, Mr. Beam

states that his interaction with Officer Laffan was otherwise amicable because Officer Laffan drove Mr. Beam to one of his court hearings.  Nothing else is alleged as to Officer Laffan to warrant his continuation as a Defendant.  He will be dismissed from this case.  As to John Does 1-10, at this stage, it is unclear what actions they undertook.  They also will be dismissed as Defendants.  Consequently, summary judgment on Counts I to XI will be entered in Defendants Chief of Police, Officer Laffan, and John Does 1-10's favor.

## V.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 54) will be granted in part and denied in part, and the following claims remain in this case against Defendants Officer Wolf and Officer Rossetti:  the excessive force claim in Count I, the civil conspiracy claim in Count III, and the battery claim in Count VIII.  An appropriate Order follows.